State ex rel. Atty. General v. Bryan et al.—Syllabus.

THE STATE OF FLORIDA, BY W. H. ELLIS, ATTORNEY-GENERAL OF SAID STATE UPON THE RELATION OF F. B. MOODIE, FRED L. STRINGER, A TRUSTEE OF THE UNIVERSITY OF FLORIDA, AND THE CITY OF LAKE CITY, A MUNICIPAL CORPORATION, RELATOR, v. N. P. BRYAN, A. L. BROWN, NATHANIEL ADAMS, P. K. YONGE, AND T. B. KING, AS THE STATE BOARD OF CONTROL, RESPONDENTS.

1. The duties to be performed by the State Board of Control, established by Chapter 5384 of the Laws of 1905, are important and essentially governmental in character. The office is continuous and permanent, and remains to be filled, though the incumbents may die or resign.

2. The Attorney General is the proper officer to file an information, in the nature of a **quo warranto**, against a person holding a public office, to inquire into his title to the same. It is a power incident to the Attorney General's office. Upon the filing of the information the writ issues upon his demand, as in ordinary actions of debt by the State against its debtors, and in a case of this character the court has no authority to grant or withhold leave to file the information.

3. Upon the Attorney General rests the responsibility for the filing of an information, in the nature of a **quo warranto**, against a person holding a public office, to inquire into his

title to the same, as well as for its form, nature and contents, including all of its allegations, and this authority and responsibility so vested in the Attorney General cannot be delegated by him to any person or persons, or even cast upon the court.

4. The proper practice in a proceeding in the nature of a quo warranto to inquire into the title of one to a public office is to institute the proceeding in the name of the State upon the relation of the Attorney General, and the mention of relators in the information other than the Attorney-General, where the proceeding is instituted by the Attorney General, is mere surplusage, which in no way affects the validity of the information or the absolute control of the case by the Attorney General.

5. In pasisng upon the constitutionality of statutes generally, no matter from what standpoint the assault thereon may be made, it is a well settled and cardinal rule that nothing but a clear violation of the constitution will justify the courts in overruling the legislative will; and where there is reasonable doubt as to the constitutionality of an act it must be resolved in favor of the act.

6. Chapter 5384 of the Laws of 1905 does not conflict with the Act of Congress, approved July 2, 1862, which donated lands for "the endowment, support and maintenance of at least one college where the leading object shall be, without excluding other scientific and classical studies, and including military tactics, to teach such branches of learning as are related to agriculture and the mechanic arts, in such manner as the legislature of the States may prescribe, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions in life," or impair the obligation of the contract made by this State in enacting Chapter 1766 of the Laws of 1870, and the acts amendatory thereof, whereby the State accepted the conditions and benefits of the grant contained in said act of Congress, the legislature being expressly authorized by the Act of Congress to prescribe the manner in which "such branches of learning as are related to agriculture and the mechanic arts" shall be taught.

State ex rel. Atty. General v. Bryan et al.—Syllabus.

7. The Legislature has the power to prescribe what college or colleges shall be the recipient or recipients of the interest on the fund derived from the sale of lands donated in the Act of Congress, approved July 2, 1862, for the maintenance of at least one college for instruction in agriculture and mechanic arts, or to bestow it for such purpose upon a university of the State, as it may elect, having also the power to withdraw the interest of this fund from any institution of learning, which has been the recipient of it, and found another institution, at any time it may elect so to do, and make it the recipient of said interest for such instruction. The Legislature also has the discretionary power to provide proper educational qualifications for admission to such State college or university, to appoint trustees thereof, subject to change, conferring such powers, not in conflict with some constitutional provision, upon them as it may see fit, or to establish a State Board of Control, as was done by Chapter 5384 of the Laws of 1905, said trustees or said State Board of Control being simply public agents to manage a public property.

8. Even if there are unconstitutional provisions in a statute, where such unconstitutional provisions can be separated from the valid portions, and the legislative purpose expressed in so much as is good can be accomplished independently of the void part, and, considering the entire act, the good and the bad features are not so essentially and inseparably connected in substance, or so interdependent that it cannot be said that the Legislature would not have passed the one without enacting the other, it is the duty of the court to give effect to so much as is good.

9. The existence of a contract is essential to its obligation, and, if there be no contract, there is no obligation of it to be violated. Even if the trustees of the Florida Agricultural College, a public institution of learning, made a specific or particular contract with the municipality of Lake City, or with the donors of certain lands and money, for the location of said College at Lake City, the Legislature would not be precluded thereby from removing the college therefrom to some other point in the State, if in its judgment it was to the best interests of the State so to do.

State ex rel. Atty. General v. Bryan et al.—Syllabus.

10. An information in the nature of a **quo warranto,** like the writ of mandamus, never lies to enforce the performance of private contracts.

11. Chapter 5384 of the Laws of 1905 is not unconstitutional because it authorizes and empowers the State Board of Education and the State Board of Control, acting in joint session, to determine the place of location of the University of the State of Florida, and of the Florida Female College, the power conferred upon said boards not being a delegation of legislative powers.

12. Chapter 5384 of the Laws of 1905 is not unconstitutional or in conflict with the Act of Congress, approved July 2, 1862, donating to the State a fund for the establishment and maintenance of at least one college as therein specified, because said Chapter 5384 provides that the State Board of Education and the State Board of Control, "shall include military tactics if the said joint boards deem the same requisite and proper," as one of the branches of education in the University of the State of Florida.

13. Chapter 5384 of the Laws of 1905 is not violative of either Section 27 of Article 3 or of Section 5 of Article 6 of the Constitution by reason of the fact that it provides for the appointment by the Governor as members of the State Board of Control of "five citizens of this State, one from East Florida, one from South Florida, one from West Florida, one from Middle Florida and one from Middle South Florida, who shall have been residents and citizens thereof for a period of at least ten years prior to their appointment," and because said Chapter further provides that "no member of said first Board shall be appointed from any county in which any of the institutions named in this act are at present located, and no appointment upon such Board shall ever be made from any county in which any institution created, established or maintained by this act is or may hereafter be located or situate."

14. Our State Constitution is a limitation upon power; and unless legislation duly passed be clearly contrary to some express or implied prohibition contained in the Constitution, the courts have no authority to pronounce it invalid.

State ex rel. Atty. General v. Bryan et al.—Syllabus.

15. The power of the Legislature to pass laws regulating appointments to statutory offices is absolute, unless restrained by some constitutional provision.

16. The principle of the maxim, **expressio unius est exclusio alterius**, should be applied with great caution to the provisions of an organic law relating to the legislative department.

17. The qualifications and exclusions of persons as members of the State Board of Control mentioned in Chapter 5384 of the Laws of 1905 relate not to classes of persons, but to place and length of residence, and such provisions do not in effect make the appointment to the office in question a legislative appointment; but, on the other hand, in compliance with the constitutional provision, such appointment is required to be made by the Governor, whose discretion of choice is not limited except as to reasonable and salutary requisites as to place and length of residence of persons to be appointed.

18. In the event the Governor should wish to remove one or more of the members of the State Board of Control established by Chapter 5384 of the Laws of 1905, it is presumed that he would do so in the way prescribed by Section 15 of Article 4 of the Constitution.

19. In construing an amendment to a section of the State Constitution it is proper for the court to consider the circumstances which led to the adoption of the amendment.

20. The office of a proviso is not to enlarge or extend the act or a section of the constitution, of which section it is a part, but rather to be a limitation, or a restraint, upon the language which the Legislature or the framers of the constitution have employed. A proviso is to be construed strictly and limited to objects fairly within its terms.

21. The term "public schools" is a comprehensive one and it should not be narrowed or restricted in its meaning, which frequently must be ascertained from the context. Sometimes it is used as synonymous with common or primary schools, at other times it is used in a far more comprehensive sense. As used in Section 25 of Article 3 of

the Constitution, as amended under the joint resolution proposed by the Legislature in 1899, and adopted at the general election in 1900, the term could not be construed to mean the "public free schools," as used in Section 1 of Article 12 of the Constitution, but must be held to refer to the other public institutions of learning existing in the State at the time of the adoption of the joint resolution proposing the said amendment.

22. The established rules of construction applicable to statutes also apply to the construction of constitutions. As a general rule, in construing statutes or constitutions, that construction is favored which gives effect to every clause and every part of the statute or section of the Constitution, thus producing a consistent and harmonious whole, and a construction which would leave without effect any part of the language used should be rejected, if an interpretation can be found which will give it effect; yet, however important it is to give significance and effect to every word, clause and sentence in a statute or section of the constitution, less regard is to be paid to the words used than to the policy which dictates the act or section of the constitution.

23. The only institution incorporated by Chapter 5384 of the Laws of 1905 is the State Board of Control, which is not an "educational, agricultural, mechanical, mining, transportation, mercantile or useful company or association" having an independent existence for private purposes, but is nothing more than a subordinate public agency, established in aid of a public purpose, therefore, the provisions of Section 25 of Article 3 of the Constitution as amended do not apply to this Board, and said Chapter 5384 does not contain special legislation on subjects forbidden by said section of the Constitution.

24. While constitutional prohibitions upon the Legislature need not always be express, but may arise from implication, yet the implied prohibition must result from the insertion of some express provision, as mere silence of the Constitution cannot be construed as a prohibition. The rule is that nothing shall be regarded as prohibited which is not

so either expressly or by fair and reasonable implication. There is nothing in Chapter 4384 of the Laws of 1905 which conflicts with the provisions of Section 3 of Article 12 of the Constitution or in any way prohibits or prevents the State Board of Education from exercising "such supervision of schools of higher grades as the law shall provide."

25. A practical construction of a statute by a governmental department, while not of such high authority as a judicial interpretation, is, when not in conflict with some provision of the Constitution or the plain intent of the act in question, of great persuasive force and is entitled to consideration by the courts.

26. Chapter 5384 of the Laws of 1905 in expressly providing for a Colored Normal School and also for a normal department to the University of the State of Florida, and also conferring upon the State Board of Education and the State Board of Control, acting jointly, authority "to establish and maintain a Normal Department for the instruction of white female teachers in the Florida Female College," at any time it may be deemed necessary, sufficiently complies with Section 14 of Article 12 of the Constitution.

27. The purpose of the provision in Section 16 of Article 3 of the Constitution requiring that "each law enacted in the Legislature shall embrace but one subject and matter properly connected therewith, which subject shall be briefly expressed in the title," was to prevent "omnibus legislation," to prevent surprise or fraud upon the Legislature by means of provisions in bills of which the title gave no notice, and which might, therefore, be overlooked, and carelessly and unintentionally adopted, and to prevent what is known as "hodge-podge or log-rolling" legislation, and to fairly apprise the people of the subjects of legislation being enacted.

28. While the provision in Section 16 of Article 3 of the Constitution is mandatory and of as much binding force upon the Legislature and upon the courts as any other provision in that instrument, and while it is the duty of the courts to

declare legislative enactments void, when questioned, that are clearly non-compliant with its requirements, still the courts in construing the acts of the legislative branch of the government should always apply a liberal rule, and refuse to declare its action void, except in clear cases that are free from every reasonable doubt.

29. It is a sufficient compliance with Section 16 of Article 3 of the Constitution if the **subject** is expressed in the title to the act, the matters properly connected with such subject not being required to be expressed in the title.

30. If the title to the act fairly gives notice of the subject of the act, so as reasonably to lead to an inquiry into the body of the bill it is all that is necessary. The title need not be an index to the contents of the bill or act.

31. The title to an act may be general, and so long as the generality of the subject therein expressed is not employed as a guise to conceal the real object of the law, or some provision therein, it will not be objectionable. It is also true that the title to an act may be so restrictive as to confine the body of the act to such phase of the subject as is indicated by the title.

32. The amplification of the title to an act so as to make it expressly mention matters germane to and properly connected with its general subject does not vitiate such title or subject it to the criticism of expressing more than one subject.

33. Unnecessary or superfluous matter contained in the title to an act will not vitiate such title or subject it to the criticism of having two distinct or incongruous subjects, provided such unnecessary or superfluous matter is not calculated to mislead or deceive but tends to call the legislator's attention more fully to the existing legislation to be affected.

34. The subject of an act may be expressed generally in the title, but, even if the general subject is not expressly named therein, if it is clearly disclosed or may be readily inferred or easily spelled out from the details expressed in the title, it will be sufficient.

State ex rel. Atty. General v. Bryan et al.—Statement of Case.

35. The provisions in Chapter 5384 of the Laws of 1905 relating to the Institute for the Blind, Deaf and Dumb and for the "education and industrial training of the blind, deaf and dumb," are not violative either of Section 1 of Article 13 or Section 17 of Article 4 of the Constitution, and such Institute is properly classed in a system with "Schools of higher grades" and is "subject to such regulations as may be prescribed by law."

36. Property which belongs to the State may be dealt with and disposed of by the Legislature without the aid of the courts. This is a legislative prerogative.

37. Chapter 5384 of the Laws of 1905 is not a revision of all the statutes of the State on the subject of the various schools and colleges of the State above the grade of common free schools, but it is an independent act covering a general and comprehensive subject.

38. The reasonableness or justice of a deliberate act of the Legislature, the wisdom or folly thereof, the policy or motives prompting it, so long as the act does not contravene some portion of the organic law, are all matters for legislative consideration and are not subject to judicial control. The courts are bound to uphold a statute, unless it is clearly made to appear beyond a reasonable doubt that it is unconstitutional.

This case was decided by the Court En Banc.

This is a case of original jurisdiction.

### STATEMENT.

The Florida Legislature, at its session of 1905, enacted the following statute:

"CHAPTER 5384.—(No. 13.)

An Act to abolish the Florida Agricultural College, now officially designated as the University of Florida, located at Lake City; the West Florida Seminary, now

known as the Florida State College, located at Tallahassee; the White Normal School located at DeFuniak Springs; the East Florida Seminary, located at Gainesville; the South Florida College, located at Bartow; the Florida Agricultural Institute, located in Osceola county, and to vacate and revoke their charters, powers, franchises and privileges, and to abolish their Boards of Trustees, managers and officers; to declare their assets and property the property of the State of Florida, and to vest the title to same in the State Board of Education in trust for the purposes provided in this act, to require the conveyance of title and the delivery of all property and assets of said abolished institutions to the said State Board of Education by the Trustees, Managers or other persons having the title, possession, custody or control of the assets of said institutions; requiring an accounting and reports therefrom, including a statement of all their liabilities and the auditing of the same; providing for the payment of the indebtedness of said institutions; revoking and abolishing all continuing appropriations made or granted thereto; for the repeal of Sections 278, 279, 280, 281, 282, 283, 284, 285, 287, 288, 289, 291, 292, 293, 294, 295, 296, 297, 298 and 299 of the Revised Statutes of Florida, relating to the creation and establishment of the Florida Agricultural College, its organization, powers, rights and privileges and matters pertaining thereto; for the repeal of Sections 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 317, 318, 319, 320, 321, 322, 323, 325, 326 and 327 of the Revised Statutes of Florida relating to the organization, creation and establishment of the Seminaries East and West of the Suwannee River, their location, powers, rights, privileges and matters pertaining thereto; the repeal of Section 268 of the Revised Statutes of

Florida relating to the establishment of a White Normal School at DeFuniak Springs, and providing for the election of a faculty therefor; the abolishing of the Normal and Industrial department created in the St. Petersburg Normal and Industrial School, located at St. Petersburg, and the repealing of Chapter 4998 of the Laws of Florida, entitled "An Act to assist in the maintaining an Industrial and Normal department in the St. Petersburg Normal and Industrial School; to create scholarships therein and to make appropriations therefor," approved May 31, 1901; providing that no further appropriations or State aid shall be made to the said institution, the striking from the name of said institution of the words "Normal and Industrial," and the relinquishing to the county of Hillsborough of all interest possessed by the State in and to the said school or its property by reason of the appropriations made and aid granted thereto; for the amendment of Section 269 of the Revised Statutes of the State of Florida relating to the establishment of a normal school for colored teachers, and providing for the election of a faculty therefor; the establisment, creation and location of the University of the State to be known as the University of the State of Florida, and one female Seminary, to be known as the Florida Female College, and for the maintenance and support of same; providing for the change of location of the Institute for the Blind, Deaf and Dumb now located at St. Augustine, and its enlargement, maintenance and support; providing for the maintenance, support and greater efficiency of the Colored Normal School located at Tallahassee, and for the change of location of the same as may be desired; for the creation of a Board of Control to manage and control all of said several institutions created and provided to be supported and maintained by this act, and to provide for their

appointment, terms of office, manner of their succession, organization, compensation, modes and manner of payment and matters connected therewith; granting unto said Board, the control and management of said institutions and every department thereof, full power and authority to that end, and for the employment of all instructors, teachers, servants and employees; for the purchase of all property, furniture, paraphernalia and matters for said institutions and the proper administration of the same, and the mode and manner by which the expense of their operation, support and maintenance shall be provided and paid; making the said Board and its actions subject to the control and supervision of the State Board of Education, and providing for joint meetings of the same; creating the said Board of Control a body corporate and prescribing its powers and duties; appropriating the assets and property of such institution so selected to the location, establishment, support and maintenance of the said institution or institutions that may be so located; providing as to how the said funds, assets and property of the abolished University of Florida shall be disposed of, including the funds arising under the Hatch and Morrill acts, and as to the establishment of the Experiment Station provided by the United States; providing for the disposition of any endowment or funds belonging to the said State College and not the property of the State of Florida in case none of said institutions created or maintained by this act shall be located at Tallahassee, and in case one of said institutions created by this act shall be located there, and for any necessary accounting between the city of Tallahassee and the State of Florida in regard thereto; providing for the establishment in the University of the State of Florida created by this act of an Agricultural, Industrial and Mechanical Department and Nor-

mal Department for the Instruction of White Teachers, Summer Schools, a classical and scientific department, and such other departments of higher education as the said Boards shall deem necessary; providing for the design of education; for the admission of students; for scholarships; for rules and regulations in that regard, and as to grades of education, and the powers of said Boards in regard thereto; providing for the appropriation of the Seminary Morrill and Hatch funds and the interest thereon as required by the acts of Congress granting the same; providing for a settlement with the city of Gainesville and the town of Lake City in case neither of the Institutions created or maintained by this act shall be located at either of said places and for the refunding of donations made by said places respectively to the institutions formerly located thereat and abolished by this act, in case that none of the institutions are located by said Boards at such points; providing for the sale and disposal of all the assets by this act not specifically appropriated, and for the creation of a fund arising from any surplus assets and property, and the disposal of the same; providing for an appropriation by the State for the purpose of aiding and assisting in carrying out the provisions of this act, and for continuing appropriation for the maintenance and support of said institutions as may be requisite and necessary from time to time; providing for the auditing and approving of all accounts in the operation, enlargement, maintenance and conduct of the institutions provided for and maintained by this act, and the modes and manner of their payment; providing as to who shall keep and have possession of all funds provided for under this act and subsequent acts in relation thereto; as to how the same shall be paid out and disposed of; providing for the pow-

20 S. C.

ers and duties of the Board of Control in relation to the prescribing of examinations and the forms thereof in the public schools of this State and as to admission therefrom and from other institutions of learning into the said institutions created and maintained by this act, and the issuance of certificates in regard to the same; for the vesting in the State Board of Education of the title to all the assets and property of the Colored Normal School and the Institute for the Blind, Deaf and Dumb; requiring the abolition of such trustees, managers and officers and the surrender of the management, possession and control of such institutions and their property to the Board of Control—the vesting in said board of all powers now provided by law and this act in regard thereto; the duties of the State Treasurer, Comptroller, Superintendent of Public Instruction, State Board of Education and Board of Control in regard to said institutions; to provide for a Normal Department and Summer School for white teachers in the Florida Female College and a Summer School for colored teachers in the colored normal school—whenever necessary, and to repeal all laws in conflict with the provisions of this act.

*Be it Enacted by the Legislature of the State of Florida:*

Section 1. That the several and respective institutions of learning and education heretofore created, chartered, fostered and maintained by this State, to-wit: The Florida Agricultural College, now officially designated and known as the 'University of Florida,' located at Lake City. The West Florida Seminary, now designated and known as 'The Florida State College,' located at Tallahassee. The White Normal School located at DeFuniak Springs. The East Florida Seminary, located at Gainesville. The

South Florida College, located at Bartow; and the Florida Agricultural Institute, located in Osceola county be, and each and every of them are hereby abolished and their and each and every of their charters, franchises, powers, rights and privileges granted to or possessed by them respectively are hereby revoked, vacated and abolished.

Section 2. That all and singular all the lands, tenements and hereditaments, estate and property, real, personal and mixed, including all bonds, funds, moneys and investments, and the rents, issues and profits thereof, had, held or possessed by the said institutions named in Section 1 of this Act, or any of them, or to which said institutions or any of them might or could have, claim, or be in any way or manner entitled to either in esse or in futuro and from any source whatsoever, be and the same are hereby declared forfeit and to revert to the State of Florida, and upon the passage and approval of this act, to vest absolutely in the State Board of Education in fee simple absolute, in trust, nevertheless, for the uses and purposes hereinafter provided for herein.

Section 3. That immediately upon the passage of this act, the several and respective trustees, managers and officers of the said several and respective institutions mentioned in Section 1 of this act, shall prepare and make up duplicate accounts and inventories of all the property, real, personal and mixed, owned, possessed, claimed or controlled by said respective institutions or said officers, managers or trustees for and on their behalf showing in detail every item of asset or liability of the said institutions respectively, and if any of said institutions shall be indebted to any person or persons, said report shall show in detail a true and correct statement of said accounts and indebtedness, as to when created, for what, to whom due and the amount thereof, and shall also prepare and de-

liver with said report duplicate vouchers for the payment
of each separate indebtedness due and properly certified
and approved by the proper officials, which said reports,
inventories, schedules and vouchers from each of the said
institutions shall be made in duplicate, and each of which
shall be certified to by the President or Chairman of the
respective Boards of Trustees or managers and sworn
to by the Secretary thereof and under the seal of the re-
spective institutions, if it or they be provided with a seal,
one of which duplicate shall be transmitted to and filed in
the office of the Comptroller, and the other shall be trans-
mitted to the Governor as President of the State Board
of Education and the said respective institutions through
their trustees, managers or other officers or whosoever
shall be vested with the title to or possessed of the respec-
tive assets and property or any part or portion thereof,
shall at once, by proper instruments of writing, duly
executed and acknowledged, grant and convey, assign,
transfer, set over and deliver unto the State Board of
Education all the assets and property, real, personal and
mixed of whatsoever nature and kind, had, held, claimed,
owned or possessed by said institutions and each and
every of them respectively, including all of the books,
papers, vouchers and records kept or possessed by them
and each and every of them.

Section 4. That all continuing appropriations hereto-
fore made to said institutions mentioned in Section 1 of
this act, or any of them, are hereby revoked.

Section 5. That the State Auditor shall, as soon as prac-
ticable after such inventories, schedules, accounts and
vouchers have been filed with the Governor and Comp-
troller and the said books, papers, property and assets be
transferred to the said State Board of Education, audit
all accounts of said institutions and each and every of

them for at least one year prior to the passage of this act, and shall check over and verify all said lists and inventories, examine into the auditing and approval of all claims and vouchers certified against said institutions for payment, and make his report thereon in duplicate, one of which shall be transmitted to the Comptroller for filing in his office, and the other shall be transmitted to the Governor as President of the State Board of Education.

Section 6. That all Boards of Trustees, managers and officers of the several institutions mentioned in Section 1 of this act, and the Boards of Trustees, officers and managers of the Blind, Deaf and Dumb Institute and of the Colored Normal School be and the same are hereby abolished.

Section 7. That Sections 278, 279, 280, 281, 282, 283, 284, 285, 287, 288, 289, 291, 292, 293, 294, 295, 296, 297, 298 and 299 of the Revised Statutes relating to the creation and establishment of the Florida Agricutlural College, its organization, powers, rights and privileges and matters pertaining thereto, be and the same are hereby repealed.

Section 8. That Sections 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 317, 318, 319, 320, 321, 322, 323, 325, 326 and 327 of the Revised Statutes of Florida relating to the organization, creation and establishment of the seminaries east and west of the Suwannee river, their location, rights, powers, privileges and matters pertaining thereto, be and the same are hereby repealed.

Section 9. That Section 268 of the Revised Statutes of the State of Florida in relation to the establishment of a White Normal School at DeFuniak Springs, and provid-

ing for the election of a faculty therefor, be and the same is hereby repealed.

Section 10. That the industrial and normal department created in the St. Petersburg Normal and Industrial School, located at St. Petersburg, is hereby abolished, and Chapter 4998, of the Laws of Florida, entitled 'An Act to assist in maintaining an Industrial and Normal Department in the St. Petersburg White Normal and Industrial School; to create scholarships therein and to make appropriations therefor, approved May 31, 1901, be and the same is hereby repealed. That no further appropriations shall be made or State aid granted to said institution; that the words 'Normal and Industrial,' shall be stricken from the name thereof, and that all right, title and interest in the said school, its buildings or property had, acquired or possessed by the State by reason of appropriations heretofore made to it are hereby granted and released unto the County of Hillsborough, in which said school is situate.

Section 11. That Section 269 of the Revised Statutes of the State of Florida relating to the establishment of a Normal School for colored teachers be and the same is hereby amended so as to read as follows:

Section 269. COLORED NORMAL SCHOOL.—A Normal School for the training and instruction of colored teachers is established under the supervision and control of the State Board of Education and the Board of Control hereinafter provided. The Board of Control shall elect a faculty to consist of a principal and two assistant instructors who shall have in charge the training and instruction of all students subject at all times to the approval of and under such rules and regulations as the Board of Control hereinafter created shall prescribe, and

such Board, under rules and regulations hereinafter to be made, shall have the power of removal of all or any of the faculty, may increase or diminish the same, and may add such other departments of instruction and education to such institution from time to time as may be deemed advisable. The Colored Normal School now established at Tallahassee shall be such school, and the faculty remain as now until changed by said board, but the State Board of Education shall have power to change the location of same at any time it may deem it of benefit or advantage to such institution or the purposes for which it was created, and that one-half of the Morrill fund coming or that may come to the State for the purposes provided in such act is set apart and appropriated to the support and maintenance of said school.

Section 12. That there shall be established, and there is hereby created the following institutions of higher education in this State, to-wit: One University to be known as the University of the State of Florida, and one Female Seminary to be known as The Florida Female College.

Section 13. That there is hereby created a Board of Control which shall consist of five citizens of this State, one from East Florida, one from South Florida, one from West Florida, one from Middle Florida and one from Middle South Florida, who shall have been residents and citizens thereof for a period of at least ten years prior to their appointment, who shall be appointed by the Governor, and their terms of office shall be for four years, and until their successors are appointed and qualified, except that of the first board appointed under this act two members thereof shall be appointed for the term of two years, and three members thereof shall be appointed for the term of four years, and thereafter every such appointment shall

be for the term of four years, except in case of an appointment to fill a vacancy, in which case the appointment shall be for the unexpired term. The Governor shall have power to remove any member of such Board for cause, and shall fill all vacancies that may at any time occur therein. No member of said first Board shall be appointed from any county in which any of the institutions named in this act are at present located, and no appointment upon such board shall ever be made from any county in which any institution created, established or maintained by this act is or may hereafter be located or situate.

Section 14. That immediately upon the passage of this act the Governor shall select five of the most capable and efficient citizens having the qualifications prescribed herein, and appoint the same as herein provided, to constitute such Board of Control, whose duty it shall be to immediately, after such appointment, assemble at the Capital and there organize by selecting one of their number as chairman. The chairman shall be elected from the long term members, and the chairmanship shall exist during his term of office. The Board shall elect a chairman as often as that office shall become vacant. The members of said Board shall be paid only their actual expenses while in the performance of their duties, and in traveling to, from, or upon the same, the accounts for which shall be paid quarterly by the State Treasurer upon itemized vouchers duly approved by the chairman of said Board and the Comptroller as is herein provided for the disbursement of funds.

Section 15. Said Board of Control, except as herein provided, shall act in conjunction with, but at all times under and subject to the control and supervision of the State Board of Education.

Section 16. As soon as practicable after the appointment and organization of the Board of Control, the Governor, as President of the State Board of Education, shall cause a meeting of both of said boards to be held in joint session at the Capital, and at said meeting shall determine the place of location of the University of the State of Florida and of the Florida Female College hereby created and established, and prescribe the general rules and regulations for the conduct and governance of the same and the proper management thereof, as well as of the other institutions, to-wit: The Colored Normal School and the Institute for the Blind, Deaf and Dumb heretofore created, and determine as to any change in location of either of said last mentioned institutions that may be necessary or required, and shall do every other matter or thing at that or some subsequent meeting as shall be necessary and requisite to fully carry into effect the provisions of this act.

Section 17. In determining the location of the University of the State of Florida created and established by this act, the said boards in joint meeting assembled shall take into consideration the lands, property, buildings and situation of the respective institutions named in and abolished by this act, having regard to the permanent location of such an institution at some central point in this State, both geographically and as to population, as well as to the needs and requirements of the same as prescribed in this act and the powers given thereunder, and the funds and means at their command, or which may naturally come to the control of the State Board of Education for such purposes, and may, if advisable, after careful consideration, appropriate either temporarily or permanently, the location, lands, buildings, property and effects of any one of said vacated and abolished institutions for such

purpose. Said Boards being hereby vested with an absolute discretion and power in the matter of location and situs of this said institution. That in the location of The Florida Female College hereby created, said Boards are hereby authorized and empowered to locate and fix the same (after they shall have located the said University) at one of the places occupied by any one of the said abolished institutions under this act, having especial regard for the character and condition of the grounds, buildings and structures thereon of such abolished institution as they may select; its location as to health and accessibility, and its adaptability to the particular needs of such an institution. Said Boards are hereby further authorized, directed and empowered to change the location of the Institute for the Blind, Deaf and Dumb heretofore created if they shall deem such changes of location wise and expedient, and after they have selected and located the said University of the State of Florida, and the said Florida Female College; in case they shall determine to change the location of the Institute for the Blind, Deaf and Dumb they shall change the same to and locate the same at one of the places now occupied by some one of the said abolished institutions which they shall select for such purpose not already selected by them for the purposes herein provided, having due regard for the necessity and requirements of the same, its situation and accessibility, and its adaptability to the purposes of such institution, and in selecting said location shall have due regard and make provisions for the complete separation, but with equal consistent accommodation and within reach and under the control of the same corps of officers, teachers and managers of the white and colored inmates of the same so that there will be no admixture or association of the races. That upon the selection of any of the loca-

tions, lands, buildings or structures by the said boards of any of the said abolished institutions for the location of the said University of the State of Florida, Florida Female College or the Institute for the Blind, Deaf and Dumb, such lands, buildings, structures, property and assets of the such abolished institutions, or so much thereof as may be necessary, so selected for said respective University, Female College or Institute, be and the same is hereby appropriated and set apart to and for the use of such respective institutions.

Section 18. That the property and assets of each and every of the said institutions abolished by this act which shall not be selected by the said Boards as a location for the said University, College or Institute, shall be sold or otherwise disposed of as in the judgment of the said State Board of Education shall be deemed best, as herein provided, and the proceeds thereof shall be applied to the establishment, support and maintenance of the said University, College and Institute, and support and maintenance of the Colored Normal School: *Provided,* That if the said Boards, in their discretion, shall select some place or places other than Lake City, in the County of Columbia, Tallahassee, in the County of Leon, or Gainesville, in the County of Alachua, for the location of the said University, College, or Institute, then in such case the said Boards shall have an accounting with the City of Tallahassee, if the said abolished institution at Tallahassee is not selected for one of the said institutions, and if it shall appear that said abolished institution at Tallahassee shall be possessed of any property, funds or endowments belonging thereto and not the property of the State and the said City of Tallahassee has paid to the State or said institution the two thousand dollars per annum provided to be

paid in and by Section 325 of the Revised Statutes of the State of Florida, that in such case the said State Board of Education shall refund to the said City of Tallahassee such proportion of said moneys, funds or endowments belonging to the said abolished institution and not the property of the State, or if it shall be found on said accounting that the said City of Tallahassee has not made the payments required by the said section of the Revised Statutes of the State of Florida, then the said State Board shall refund so much of said funds or property of said abolished institution coming to said Board as the assets of the said abolished institution, less the amount due or owning by said city under the provisions of said section. And in case the said city of Gainesville shall not be selected by said Boards as one of the places for the location of one of said institutions, then the said Board of Education shall refund to the said City of Gainesville out of the assets and property of the abolished institution located at such place, so much of the lands and property of the same, or its equivalent at its then value, as was donated to the said State by the said City of Gainesville; and if the said boards shall not select the abolished institution located at Lake City as one of the places for the location for one of the said institutions, then the said State Board of Education, out of the assets and property coming to it from the said abolished institution at that place, shall refund to the said city of Lake City the fifteen thousand dollars and the one hundred acres of land donated by Lake City to the said institution upon its establishment at that place, and in case the Institute for the Blind, Deaf and Dumb is removed from its present location then its assets and property shall be used or the proceeds thereof for its re-location, establishment and maintenance with such other funds as

may be required, *Provided,* That of the buildings, property or assets of any abolished institution which may not be used, appropriated or otherwise disposed of under this act, the State Board of Education and State Board of Control, in joint session, may, in their discretion, if they shall deem the same advisable and for the best interests of the State, set apart and appropriate the same, or any portion thereof to the county or counties in which the same may be located for the purposes of Public High Schools in such county or counties under such restrictions and terms, or for such time as they may deem proper and just.

Section 19. The Board of Control shall have jurisdiction over and complete management and control of all the said several institutions and each and every of them, to-wit: The University of the State of Florida, The Florida Female College, the Colored Normal School, and The Institution for the Blind, Deaf and Dumb, and is hereby invested with full power and authority to make all rules and regulations necessary for their governance not inconsistent with the general rules and regulations made or which may be made at any joint meeting of the said Board with the State Board of Education. To appoint all the managers, faculty, teachers, servants and employees, and to remove the same as in their judgment and discretion may be best; fix their compensation and provide for their payment. To have full management, possession and control of each and every of the said institutions and every department thereof, and the lands, buildings, structures and property belonging thereto. To provide for the course of instructions and the different branches and grades to be kept and maintained thereat, and to alter and change the same. To visit and inspect the said institutions and each and every department, and to provide

for the proper keeping of accounts, registers and records thereof. To make and prepare all necessary budgets of expenditures for the enlargement, proper furnishings, maintenance, support and conduct of the same. To audit and approve all the accounts and expenditures, supervise the employment and removal of all teachers and instructors; select and purchase all property, furniture, fixtures, paraphernalia necessary for the same from time to time; to build, construct, change, enlarge, repair and maintain any and all the buildings or structures now in existence, or that may hereafter be necessary for each and every of said institutions created and maintained by this act; to purchase and acquire all lands and property necessary for same of every nature and description whatsoever; and to care for and maintain the same, and to do and perform every other matter or thing requisite to the proper management, maintenance, support and control of each and every of the said institutions necessary or requisite to carry out fully the purposes of this act, and for raising to and maintaining them at the proper efficiency and standard as required in and by the provisions of this act, but at all times subject to the supervision and control of the State Board of Education.

Section 20. That Section 270 of the Revised Statutes of the State of Florida be and the same is here amended so as to read as follows:

Section 270. BOARD OF MANAGERS—That the State Board of Education be and the same is hereby vested with the title to all the assets and the property of the Institute for the Blind, Deaf and Dumb that it is now or may hereafter become entitled to, but the control, possession and management thereof and of the said Institute and each and every department thereof be and the same is hereby vested in the Board of Control according to the

terms and provisions of this act except as may be herein otherwise provided.

That Section 271 of the Revised Statutes of the State of Florida providing for the present location of the said Institute for the Blind, Deaf and Dumb at St. Augustine be and the same is hereby repealed. That the powers provided for in Sections 275 and 276 of the Revised Statutes of the State of Florida vesting the same in the said State Board of Education as Trustees of the Institute for the Blind, Deaf and Dumb are hereby vested in the Board of Control as provided in this act, and so much of said sections as vests in the State Board of Education the management and control of the said Institute are hereby repealed.

That Section 277 of the Revised Statutes of the State of Florida providing for report of the Board of Managers of the Institute for the Blind, Deaf and Dumb, be and the same is hereby repealed.

That the Board of Control provided in this act shall have all the powers and duties in regard to the management and control of the Institute for the Blind, Deaf and Dumb located in this State as is provided for in Chapter 3, Part One, Title Five, of the Revised Statutes of the State of Florida and Chapter 5209 of the Laws of Florida, the same being an act entitled an act to provide for the education and industrial training of the blind, deaf and dumb of the State of Florida, approved June 4, 1903.

· That the Trustees created and appointed by said last mentioned act are hereby abolished, and that wherever the words 'Board of Trustees' appear in said act they be stricken out, and whatever powers and duties in and by the said act are given to such Board of Trustees that such powers and duties are hereby vested in and shall be exer-

cised by the said Board of Control. That said Trustees and all persons or officers vested with title or possession to any of its property do immediately convey the same to the State Board of Education. That Section 2 of said act, the same being an act entitled an act to provide for the education and industrial training of the Blind, Deaf and Dumb of the State of Florida, be and the same is hereby repealed.

Section 21. The University of the State of Florida shall have and contain the following departments and such other departments as may from time to time be determined upon and added at any joint meeting of the State Board of Education with the said Board of Control, to wit: A Department of Agriculture, Mechanical and Industrial Arts; a Scientific and Classical Department.

A Normal Department for the training and instruction of white teachers. It being intended that the design and scope of this institute shall be to teach such branches of learning as are related to Agriculture and the Mechanical and Industrial Arts, Scientific and Classical studies and instructions in all the various higher branches of education; the fundamental laws and in what regards the rights and duties of citizens, and shall include military tactics if the said joint Boards deem the same requisite and proper.

That all Summer Schools now or that may be hereafter provided for shall be taught, had and held in and at the University of the State of Florida, and the Board of Control shall make such necessary provisions therefor as shall be requisite and necessary; *Provided*, That whenever a normal department shall be established at the Female College a branch of such summer school may be there located if deemed advisable, and the boards may establish summer schools for colored teachers at the colored

normal school whenever it shall deem the same necessary.

Section 22. The design of the Florida Female College shall be to teach and instruct in all the higher branches of education, and in all the useful arts and sciences that may be necessary or appropriate to be taught in like institutions, and as may be deemed requisite and necessary from time to time by the joint Boards herein provided for its governance and control. None but female white students shall be admitted to this institution, and no student shall be admitted therein unless and until she shall have passed a satisfactory examination in some High School of this or some other State having a like standing and through or beyond the tenth grade as now established for the High Schools in this State, or such other grade not lower than the tenth grade as may be hereafter established, and no student from any other State shall be admitted to such institution, except by the consent and upon the certificate of the State Board of Control.

That the State Board of Education jointly with the Board of Control is hereby authorized and empowered at any time it may deem the same requisite or necessary, to establish and maintain a Normal Department for the instruction of white female teachers in the Florida Female College, and when established the same shall be under the charge and control of the State Board of Control, with all the powers and duties in relation thereto as provided herein, and under such rules and regulations as it shall prescribe.

Section 23. No student shall be admitted to the University of the State of Florida who has not passed a satisfactory examination at some High School and through the twelfth grade as now established, or some other institution of learning having an equivalent of instruction to the

21 S. C.

twelfth grade. The State Board of Control may change the grade at any time they may see fit as a prerequisite to such entrance. No person shall be admitted to said University except white male students having the prerequisite qualifications to which the said Board of Control may add others in their judgment and discretion, except to the Normal Department thereof for the instruction and education of teachers; when both male and female students may be admitted to that department.

Section 24. In case of the admission of students to either the said University or College from other States, the same may be admitted by and with the consent and upon the certificate of the Board of Control upon such terms as to tuition, board, etc., as the said Board may from time to time establish.

The several departments of the said College and of the said University shall be open to applicants for admission who are citizens of this State at the lowest rate and expense consistent with the welfare and efficiency of the respective institutions, and as may be established from time to time by the said Board. Each county shall have the right to send one student annually, or so often as vacancies may occur to each of the said institutions and normal department, such students to be selected by the Board of Public Instructions of the several counties possessing the qualifications required for admission thereto, and such students so selected shall be received into said respective institutions and entitled to receive the benefits of a full course of instruction at either said College or University, or Normal Department, or other institution aforesaid, without any charge for instruction, but subject to such rules and regulations as may be established by the said Board for the governance and direction of the same,

State ex rel. Atty. General v. Bryan et al.—Statement of Case.

and the Board may make such requisite as to previous instruction for entries into the Normal Departments as it shall deem best.

Section 25. The joint boards, as soon as they shall have located the said University, College and Institute for the Blind, Deaf and Dumb as herein provided, shall take and appropriate from the different libraries and laboratories of the several abolished institutions so much of said literature and paraphernalia and apparatus as may be necessary to thoroughly equip the four said respective institutions, and the balance, if any remains, shall be disposed of as is hereinafter provided for the disposal of other property not used.

Section 26. That all the bonds, moneys, properties and assets belonging to the University of Florida, abolished by this act, or held in any way or manner for its benefit or which it might or could be entitled to, are directed to be transferred and conveyed under the provisions hereof and hereby set apart and appropriate exclusively to the establishment, maintenance and support of the University of the State of Florida, and all and singular the rents, revenues, issues and profits thereof, and the Florida Agricultural Experiment Station established as a department of the University of Florida, shall be and remain a Department of the University of the State of Florida, together with all the rents, benefits, donations and emoluments that may accrue therefrom, or under the act of Congress commonly known as 'the Hatch' Act, or under the act of Congress commonly known as the 'Morrill Act' in so far as the same or so much thereof can be used and appropriated for the benefits of said institution by the provisions of said acts, and that the provisions of Sections 286 and 290, Revised Statutes of Florida, are made appli-

cable hereto in so far as the same are or  can be  made
effective, and all estate, right, property, claims, emolument
and the rents and issues  thereof or any  substitutions
thereof, and all claims and demands arising or that may
or can arise thereunder or any act of Congress in that re-
gard are hereby preserved, maintained and transferred to
the State Board of Education for the use and benefit of
the University of the State of Florida.

Section 27. The bonds, property, assets and  effects of
every nature and description whatsoever, including all the
donations belonging or donated to the West Florida Sem-
inary or the Florida State College, its successor, and the
rents, revenues, issues and profits thereof, provided the
said Female College shall be located  by the said  joint
Boards at Tallahassee, be and the same is hereby appro-
priated and set apart for the establishment, maintenance
and support of the said Female College.   In case the said
Florida Female College shall not be located at Tallahas-
see, then so much of the said funds and property of the
said abolished Florida State College as shall, after settle-
ment with the City of Tallahassee, belong to it and that
shall come to the hands of the said State Board of Educa-
tion shall be set apart, together with such other funds as
they shall deem best to appropriate for such purpose out
of any moneys that may come to the hands of the State
Board of Education applicable thereto for the  establish-
ment, maintenance and support of the said Florida Fe-
male College.

Section 28. All other funds, appropriations and prop-
erty of every nature and description which may come to
the State of Florida or the hands or control of the State
Board of Education, for such purpose, or which may law-
fully be applied to the promotion and  advancement  of

schools of higher education in this State, including the assets of said abolished institutions not otherwise dis posed of, shall be held and appropriated by the State Board of Education in conjunction with the Board of Control for the maintenance and support of the said four respective institutions equally and ratably in proportion as the needs of the said respective institutions may from time to time require the same, in the judgment of the said Boards. *Provided,* That what is known as the seminary fund shall be subject to the control, management and investment of the State Board of Education as a fund for the benefit of the Florida Female College and the University of the State of Florida, the interest arising from which shall be used and appropriated for the maintenance and support of said two institutions in equal proportion and that one of said institutions shall be located west and the other east of the Suwannee river.

Section 29. That the State Board of Education, through its President, is hereby authorized and empowered to sign all vouchers for all moneys coming to said institutions created and maintained by this act from the United States, or any fund provided by the United States and which shall be paid by it to the State for the benefit of the said institutions and shall deposit the same with the Treasurer of the State of Florida, to be disposed of under the provisions of this act.

Section 30. The sum of one hundred and fifty thousand dollars, or so much thereof as may be necessary, is hereby appropriated, in addition to the funds already disposed of in and by the provisions of this act, or that may be in or come to the hands of the State Board of Education as hereinbefore provided for the purposes herein, for the establishment, maintenance and support of the said four

institutions hereby created and maintained by this act, to-wit:

For the establishment, maintenance and support of the University of the State of Florida; for the establishment, maintenance and support of the Florida Female College; for the enlargement, location, maintenance and support of the Blind, Deaf and Dumb Institute, and for the maintenance and support of the Colored Normal School, which shall be placed to the credit of the State Board of Education, in the hands of the Treasurer, to be expended and disposed of upon vouchers as provided for herein by the Board of Control in such proportion to each of the said respective institutions as in the judgment and discretion of the said Boards may seem best, and the Legislature shall, at each session, make the like or some reasonable and sufficient appropriation for the continuance, maintenance and support of such institutions.

Section 31. That the said State Board of Education is hereby directed, authorized and empowered, out of the appropriations made under this act, or that from time to time shall be made, or any other fund or property which shall vest in it under this act to set apart and pay to the fund with which it is vested for the use of the University of the State of Florida annually the sum of two thousand seven hundred and sixteen dollars, being the necessary amount to raise interest upon the bonds transferred to the said Institution by this act from three per cent. to five per cent., as is provided in Chapter 5273 of the Laws of Florida, the same being an act entitled an act making annual appropriation for the University of Florida at Lake City; to make up deficit caused by shrinkage of interest on certain bonds according to the terms and provisions of said act.

VOL. 50, JUNE TERM, 1905.                327

State ex rel. Atty. General v. Bryan et al.—Statement of Case.

The said sum of two thousand seven hundred and sixteen dollars required therefor shall be included in each appropriation made by the Legislature for the benefit of the said fund required under the Act of Congress of July 2, 1862, and that the Treasurer of the State of Florida shall set apart said amount upon the order of the said Board according to the provisions of such act.

Section 32. The Treasurer of the State of Florida shall receive and pay out all moneys and funds provided for in this act, or which shall come to the hands or control of the State Board of Education in any way or manner for the purposes thereof, and he shall keep all said moneys so received in a separate fund, and classify the same as provided herein, or by any law of the United States relating to any portion thereof, of which he shall render an annual report to the Governor of the State of Florida showing in detail the amounts received and from what funds and sources, and expenditures, when paid and to whom, and no moneys shall be paid out by him except upon a warrant drawn by the Comptroller upon the funds in his hands, a duplicate voucher from the Board of Control showing the purposes of such expenditures, which voucher shall bear the approval of said Comptroller, shall be filed with him.

Section 33. The Board of Control shall pay any and all items of indebtedness of the institutions abolished under this act after the same shall be vouchered, audited and approved as hereinbefore provided, by drawing their voucher therefor in duplicate and transmitting the same to the Comptroller to be approved by him, and the said Comptroller shall draw his warrant on the State Treasurer who shall pay the same in the modes and manner as provided in Section 34 of this act, out of any funds in his hands available for the purposes of this act.

Section 34. No moneys shall be expended for and on behalf of any of the said institutions, or any department thereof except upon a written voucher drawn by the Board of Control, in duplicate stating the nature of said expenditures, and the person to whom the same shall be made payable, which vouchers shall be submitted to the Comptroller of the State of Florida, and audited and approved by him, and upon such approval the Comptroller shall draw his warrant upon the State Treasurer for the payment thereof, transmitting duplicate of said voucher approved by him, to the Treasurer, and shall file the other duplicate of said voucher approved by him in his office. No voucher shall be issued or drawn by the Board of Control for the payment of any moneys except the same be approved by said Board in regular session and countersigned by the Chairman and Secretary thereof.

Section 35. The State Board of Control shall be a body corporate, and shall have a corporate seal to be selected by it at its first meeting; shall elect a Secretary, and remove him at will; have and employ all necessary clerks and servants ;shall have power to contract and be contracted with; sue and be sued; plead and to be impleaded in all courts of law and equity; to receive donations; to make purchases of lands and tenements, and to contract for the sale and disposal of the same, but the title to all such donations and property however acquired, shall be vested in the State Board of Education, and shall only be transferred and conveyed by it, and shall have and possess all the powers of a body corporate for all the purposes created by or that may exist under the provisions of this act, or any act or acts amendatory thereof.

Section 36. That the institutions and the trustees, managers and officers thereof abolished, transferred or chang-

ed under the provisions of this act shall remain and hold their respective offices and positions until after the Board of Control provided in this act has been appointed and organized and shall have taken possession of the same and assumed the powers and duties thereof, and the same are hereby directed, authorized and empowered, that as soon after their appointment, organization and joint meeting with the State Board of Education as herein provided, to take charge of all and singular the said abolished institutions, their assets and property, as well as the institutions created and maintained by this act, and assume the duties, powers and control thereof provided for herein, and take upon themselves all the responsibility therefor.

That the several and respective institutions abolished by this act shall not be disturbed in their present operations until the end of the present school year, to-wit: The first day of June, A. D. 1905.

Section 37. That the State Board of Education, the State Board of Control, the Treasurer and the Comptroller shall each make a separate and complete report of all their respective acts and doings to the Legislature that shall assemble in the year 1907 and to each meeting of the Legislature thereafter, and that the said State Board of Education, Board of Control, Treasurer and Comptroller shall make an annual report complete in every detail of their acts and doings, showing all moneys received and disbursed, purposes for which the same were received and made, and every matter and thing connected with the institutions, moneys, funds, property of the said respective institutions under their charge and control, which said reports the said Comptroller is hereby directed to have printed, published and distributed for general information. The Comptroller is hereby made examiner for said

institutions and shall examine the same semi-annually and as often as in his judgment may be required or necessary.

Section 38. That the said Board of Control are hereby authorized and empowered to provide a system and course of written examinations by question and answers for all the public high schools in the State, and that no  pupil shall be admitted to said high schools or be advanced to any successive grade therein, or shall be permitted to enter any institution created or maintained in and by this act until such examinations have been had according to such procedure, and the result of said examinations shall have been approved by the said Board of Control in each instance and a certificate of such admission or advancement by the said Board of Control, and the said Board shall have power to alter and change these rules and regulations from time to time where it shall be deemed necessary, and shall provide all the necessary blanks and distribute the same for such purpose.

Section 39. That the Superintendent of Public Instruction is hereby directed and it is made his duty to make an inspection of each and every of the institutions created and maintained by this act once in each month and  to make report thereof in writing to the Governor and a duplicate annual report embodying the results of his monthly reports, one to the Governor and one to be filed with the Comptroller.

Section 40. That all laws or parts of laws in conflict with the provisions of this act be and the same are hereby repealed.

Section 41. That this act shall take effect upon its passage and approval by the Governor, or becoming a  law without such approval.

Approved June 5th, 1905.

On the 7th day of November, 1905, leave of court first having been asked, the following information was filed: "W. H. Ellis, Attorney General of the State of Florida, who sues for the said State in this behalf, comes into court here, on this day, and for said State, and in the name and by the authority thereof, upon the relation of F. B. Moodie and Fred. L. Stringer, a Trustee of the University of Florida, and the City of Lake City, a municipal corporation under the laws of the State of Florida, gives the court here to understand and be informed that N. P. Bryan, A. L. Brown, Nathaniel Adams, P. K. Yonge and T. B. King, have each for the space of 90 days last past and more, in said State exercised and used without warrant of law and are each exercising and using without warrant of law, the office and the functions and powers thereof of member of the Board of Control, also known and described as the State Board of Control, and have for the time aforesaid jointly exercised and used without warrant of law and are jointly exercising and using without warrant of law, the franchises, privileges, liberties, powers and functions of a body corporate under and by the name of the Board of Control, and also known and described as the State Board of Control, including the power to have a corporate seal, electing a Secretary and removing such at will, to employ clerks and servants, to contract and be contracted with, sue and be sued, plead and be impleaded in courts of law and equity, to receive donations, to make purchases of land and to contract for the sale and disposal of the same and under such name have used and exercised without warrant of law and are, without warrant of law, exercising the general powers of a body corporate and as such have without warrant of law assumed complete jurisdiction, management and con-

trol of certain pretended public institutions of higher edu-
cation of the State of Florida, known by names re-
spectively as follows, to-wit: The University of the
State of Florida, which includes as part thereof the Agri-
cultural College at Lake City, the Florida Female College
at Tallahassee, the Colored Normal School at Tallahas-
see, and the Institute for the Blind, Deaf and Dumb, at
St. Augustine, Florida, and full authority to make all
rules and regulations necessary for their government not
inconsistent with the general rules and regulations which
may be or have been made, at any joint meeting of said
Board of Control with the State Board of Education, and
to appoint all the managers, faculties, teachers, servants
and employes thereof, and to remove the same as in their
judgment and discretion may be best; to fix their compen-
sation and provide for their payment; to have full man-
agement, possession and control of each and every of the
said pretended institutions, and every department thereof,
and the lands, buildings, structures and property belong-
ing thereto, and to provide for the course of instructions
and the different branches and grades to be kept and
maintained thereat, and to alter and change the same;
and to visit and inspect the said institutions and every
department thereof, and to provide for the proper keeping
of accounts, registers and records thereof; and to make
and prepare all necessary expenditures for the enlarge-
ment, proper furnishings, maintenance, support and con-
trol of same, and to audit and approve all the accounts
and expenditures, supervise the employment and removal
of all teachers and instructors, and to select and purchase
all property, furniture, fixtures, paraphernalia necessary
for the same from time to time; to build, construct,
change, enlarge, repair and maintain any and all the

buildings or structures now in existence or that may here-
after be necessary for each and every said institution
aforesaid, and to purchase and acquire all lands and prop-
erty necessary for same, of every nature and description
whatsoever, and to care for and maintain the same, and
to do and perform every other matter or thing requisite
to the proper management, maintenance, support and con-
trol of each and every of the said institutions, subject
only to the supervision of the State Board of Education.
And have also without warrant of law issued and taken
and exercised all the powers and duties in regard to the
management and control of the Institute for the Blind,
Deaf and Dumb of the State provided for in Chapter 3,
Prt. One, Title Five of the Revised Statutes of the State
of Florida, and Chapter 5209 of the Laws of Florida, the
same being an act entitled an act to provide for the edu-
cation and industrial training of the Blind, Deaf and
Dumb of the State of Florida, approved June 4, 1903.
And have also without warrant of law, exercised and are
exercising without warrant of law, the jurisdiction, or-
ganization, management and conduct of the University of
the State known as and called the University of the State
of Florida, with the following departments, to which de-
partments they exercise, without warrant of law, the
power to add others as may be determined by them at any
joint meeting of said Board of Control with the State
Board of Education, to-wit: A Department of Agricul-
ture, Mechanical and Industrial Arts, A Scientific and
Classical Department, A Normal Department for the
training and instruction of white teachers, the design
and scope of which University, as declared, being to teach
such branches of learning as are related to Agriculture
and Mechanical and Industrial Arts; Scientific and Clas-
sical studies and instructions in all the various higher

branches of education, the fundamental laws and in what
regards the rights and duties of citizens, and said pow-
ers so used and exercised without authority or warrant of
law by said Board of Control includes Military Tactics;
and the providing and establishing, the managing and
controlling Summer Schools to be had and held at · the
University of the State of Florida, and with the  State
Board of Education also to establish a Normal Depart-
ment at the Florida Female College, and if deemed advis-
able to establish Summer Schools at the Colored Normal
School or College.   And also have without warrant of law,
exercised, and are exercising without warrant of law, the
jurisdiction, organization, management and   control   of
the Florida Female ·College at Tallahassee, the design of
which college is declared to be to teach and instruct in all
the higher branches of education, and in all   the   useful
arts and sciences that may be necessary or appropriate to
be taught in like institutions, and as may be deemed   re-
quisite and necessary from time to time by them as such
Board of Control and State Board of Education as joint
boards, provided for its government and   control.   And
other powers by them as such Board of Control assumed
and exercised without warrant of law, and which they are
as such exercising without warrant of law, are to admit
no student to the said Florida Female  College,   except
such white female students as may or shall have passed
a satisfactory examination in some High School of this or
some other State having a like standing and through and
beyond the tenth grade as   now   established   for   High
Schools of this State or such other grade as may be here-
after established for and to admit no student to said in-
stitution except upon their   certificate acting   as   such
Board of Control; and also jointly with the State Board
of Education, at any time the State Board of Education

may deem the same requisite or necessary to establish and maintain a Normal Department for the instruction of white female teachers in the Florida Female College, and when the same is established, to exercise all charge and control thereof with all the powers and duties in relation thereto as provided in the case of the Florida Female College and under such rules and regulations as they acting as such Board of Control may prescribe; and also to admit no students to the University of the State of Florida, except white male students who have passed a satisfactory examination at some High School and through the twelfth grade as now established, or some other institution of learning having an equivalent of instruction to the twelfth grade; and to change the grade at any time they may see fit as a prerequisite to such entrance; and to admit no students to said University except white male students having the prerequisite qualifications to which they acting as such Board of Control may add other in their judgment, except to the Normal Department for the instruction of teachers; and to admit students from other States to both or either of the said University or Female College by and with the consent and upon their certificate as the certificate of the said Board of Control; and to make such rules and regulations as to previous instruction for entries into the Normal Department as they shall deem best. And also without warrant of law, have exercised and are exercising without warrant of law jointly with the State Board of Education, wrongfully and without authority of law, have assumed the powers to permanently locate the said University at Gainesville, the Florida Female College at Tallahassee, the Institute for the Blind, Deaf and Dumb at St. Augustine, and are proceeding to prepare plans and specifications for the erection of University buildings at Gainesville, Florida, and have

without warrant of law  exercised,  and are  exercising without warrant of law, the power to take possession of the two Seminaries of the State, one east and the other west of the Suwannee river, the State Normal School at DeFuniak Springs, the South Florida Military College at Bartow, and to take and appropriate from the different libraries and laboratories thereof so much as shall be necessary to thoroughly equip the said University, Female College, the Institute for the Blind, Deaf and Dumb, and Colored Normal College, and any and all of the  other property, equipments or paraphernalia of such several institutions to be sold or otherwise disposed of as in the judgment of the State Board of Education shall be deemed best.  Also they the said N. P.  Bryan,  A. L.  Brown, Nathaniel Adams, P. K. Yonge and T. B. King, acting as such Board of Control, have without warrant of law exercised and are exercising without warrant of law, the power to draw and issue vouchers for and on behalf of the said University, Florida Female College, Institute for the Blind, Deaf and Dumb, and Colored Normal College, on the Treasurer of the State of Florida, to be paid upon approval of the Comptroller; and to make reports of their acts and doings as such Board of Control to the Legislature that shall assemble in the year 1907, and to  each meeting of the Legislature thereafter, showing all moneys received and disbursed, purposes for which the same were received and made, and every matter and thing connected with the said Institutions, moneys, funds, property of the respective institutions under their charge  and  control, etc.   And have also usurped and exercised and are exercising without warrant of law, the  power to provide  a system and a course of written examinations by questions and answers for all the public High  Schools in the State and the right and power to approve any and all examina-

tions of students entering such High Schools of the State and passing from one grade to another thereof and to give certificates of such approval before any student shall be allowed to enter such High Schools, or pass from one grade to another therein; and to alter and change such rules and regulations where it shall be deemed necessary, and to provide all necessary blanks and distribute the same for such purposes. All which liberties, authorities, privileges and franchises with others, the said N. P. Bryan, A. L. Brown, Nathaniel Adams, P. K. Yonge and T. B. King, as the liberties, etc., of a body corporate under the name of the Board of Control, also known as the State Board of Control, upon the State of Florida, during all the time aforesaid, have usurped and still do usurp, within the State of Florida, and within the jurisdiction of this court. And the Attorney General aforesaid of the State aforesaid, who prosecutes aforesaid, upon the relation of said B. F. Moodie and said City of Lake City, further gives the court to understand and be informed that it is claimed or pretended by the said N. P. Bryan, A. L. Brown, Nathaniel Adams, P. K. Yonge and T. B. King, that the said University under and by the name aforesaid, the Florida Female College, the Colored Normal College and the Institute for the Blind, Deaf and Dumb so unlawfully assumed to be managed and controlled by them as aforesaid, as the Board of Control or State Board of Control, are institutions of learning in the State of Florida, created, managed and conducted by the State of Florida, through them as the Board of Control or State Board of Control, as public officers of the State, and supported out of the public funds of the State, and that they are such public officers of the State by appointment of the Governor under and by virtue of an act of the Legislature

22 S. C.

of Florida, approved June 5th, 1905, known as Chapter 5384, Laws of Florida, and that they pretend and purport to exercise the said powers, functions, privileges and franchises under and in pursuance of the said act.  But the Attorney General aforesaid, prosecuting as aforesaid upon the relation of the relators aforesaid, avers that the said act is in violation of the  Constitution of the State of Florida and the Constitution of the United States, and is void and of no effect, and confers no powers, functions, franchises or privileges upon them.  For that by Act of Congress of July second, 1862, the fund for the establishing and maintenance of the Florida Agricultural College was donated by the Government of the United States for the certain purpose therein expressed as follows, to-wit: 'To teach such branches of learning as are related to agriculture and the mechanic arts, without excluding other scientific and classical studies, and including military tactics, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions of life.'  And the act of the legislature, section 279 of the Revised Statutes of Florida, in words accepted said donation for the same purpose; and for that the contract then and there and thereby entered into by and on the part of the State of Florida, with the Government of the United States, and the Act of Congress upon the subject which is the Supreme Law of the Land,  requires the said State to use the said funds for the maintenance of a college of the class expressed in the words and terms of the contract created in the transaction of the said donation and acceptance, and according to the terms of the Act of Congress, whereas, under the requirements of the said Act of the Legislature, no students can be admitted to said Agricultural College, except  those who have passed a satisfactory  examination at  some High

School and through the twelfth grade as now established, or some other institution of learning having an equivalent of instruction to the twelfth grade, which excludes the persons and classes for whom said provision of said Act of Congress was made. So that the said act is void as impairing the obligation of the contract and as conflicting with the said Act of Congress. And also for that the said act impairs the obligation of the contract of the State of Florida, with the people who donated to the Board of Trustees of the Florida Agricultural College who were agents of the State for the purpose of locating said college, $15,000, and 100 acres of land in consideration of the location of the Agricultural College at Lake City, as hereinbefore mentioned, in that the said act provides for the removal of the Florida Agricultural College from Lake City, without any cause for such removal, and also takes from them their property in the premises without due process of law. And for that it is provided by Section 1, Article III of the Constitution of the State, that the legislative authority of the State shall be vested in a Senate and a House of Representatives, which shall be designated the Legislature of the State of Florida; whereas in and by the said act of the Legislature has attempted to delegate its powers of making laws in the matter of the removal of the said Florida Agricultural College, and the location of the University thereby created, the said institution having been located by law, section 289 Revised Statutes of Florida; and for that, in the said Act of Congress donating to the State the said fund for the establishment and maintenance of the Florida Agricultural College, and in the act of the Florida Legislature accepting the same, it is provided that military tactics shall be taught in the said college; and whereas, in and by the said act of the Legislature, Chapter 5384, it is provided

that military tactics shall only be taught in the University including the Agricultural College in the event it shall be so determined by the said joint board therein mentioned. And for that in and by the Constitution of the State of Florida the disqualifications of persons for office in said State and the powers of the Legislature to enact laws excluding persons from offices in said State are prescribed and limited; but it is provided in and by the said act, Chapter 5384, that the Board of Control therein and thereby provided for, shall consist of five citizens of the State, one from East Florida, one from South Florida, one from West Florida, one from Middle Florida and one from Middle South Florida, who shall have been residents and citizens thereof for a period of at least ten years prior to their appointment, and that no member of said first Board should be appointed from any county in which any of the institutions named in said act were located, and no appointment upon such Board shall ever be made from any county in which an institution created by the act may or might be located or situated, which provisions are contrary to and in violation of the Constitution of said State; and for that it is provided by Section 25, Article III of the Constitution of the State of Florida that the Legislature shall provide by general law for incorporating such educational, agricultural, mechanical, transportation, mercantile and other useful companies or associations as may be deemed necessary, but it shall not pass any special law on any such subject, and any such special law shall be of no effect; provided, however, that nothing therein shall preclude special legislation on subject as to a University, or the public schools, or as to a ship canal across the State, whereas the said act contains special legislation on subjects forbidden by said section of Constitution, to-wit: The Florida Female College, The Insti-

tute for the Blind, Deaf and Dumb, The Colored Normal School, and other institutions not connected with the University, the public schools nor a ship canal across the State. And for that it is provided by Section 3, Article XII of the Constitution of the State of Florida, that the Governor, Secretary of State, Attorney General, State Treasurer and Superintendent of Public Instruction, shall constitute a body corporate to be known as the State Board of Education of Florida; and it is provided in and by said act, Chapter 5384, that the said Board shall for certain purposes therein mentioned, to-wit: The location of the several institutions therein provided for, and other purposes, be a joint board with the Board of Control, provided for in and by the said act, which provision attempts to increase the number of the State Board of Education and to add other persons thereto, and to intermingle outside persons with a constitutional board, and to have an outside board act as a part of a constitutional board, to have said constitutional board, to-wit: said State Board of Education, act as a joint board contrary to the Constitution of said State; and it is also provided in and by said Section 3, Article XII of the Constitution of the State of Florida, that the said State Board of Education shall have management and investment of all State School funds, under such regulation as shall be provided by law, and such supervision of schools of higher grades as the law shall provide; whereas it is provided in said act that the board shall have supervision of the Board of Control therein provided for, in the management and conruct of the several institutions therein and thereby provided for which said institutions are not part of the system of public free schools of the State, and in conflict with the limitation upon the power of the Legislature to add to or increase the powers and duties of the State

Board of Education of Florida, in matter unconnected
with their constitutional jurisdiction.  And for that, it is
provided for in Section 14, Article XII, by the Constitu-
tion of the State, that the Legislature at its first   session
shall provide for the establishment,   maintenance   and
management of such Normal Schools, not to exceed two,
as the interests of the public education might   demand;
and that thereafter the Legislature at its session held in
1887, by act approved on May 31, 1887, did establish and
have until the passage of the said act, maintained such
Normal Schools, one established at Tallahassee and   the
other at DeFuniak Springs; and whereas it is provided
in and by the said act that the said State Normal School
established and located at DeFuniak Springs, be dis-estab-
lished and added to the University therein provided for, as
a part thereof; and for that, it is provided in Section 16,
Article III, of the Constitution of the State, that each law
enacted in the Legislature shall embrace but one subject
and matter properly connected therewith, which subject
shall be briefly expressed in the title; and whereas the
said act is in conflict therewith, and is void and of no
effect, in that the same contains more than one subject
and matter properly connected therewith, which several
and divers subjects are expressed both in the   title   and
body of the act, to-wit:    (1)  A University of the State,
(2) The Florida Female College, (3) The Institution for
the Blind, Deaf and Dumb, at St. Augustine, Fla., (4)
The State Normal School for Colored  People at   Talla-
hassee, (5) The Seminary East of the Suwannee River at
Gainesville, Florida, (6) The Seminary West of the Su-
wannee River at Tallahassee, Florida, (7) The Normal
School for White Students at DeFuniak Springs, Florida,
(8) The Normal School at St. Petersburg, Florida, (9)
The South Florida Military College at Bartow, Florida,

(10) The provisions for examination for the public free schools and high schools of the State, (11) the provisions for Summer Schools, (12) Appropriation of property to high schools; and for that the said act, Chapter 5384, attempts to vest the assets and property of the Institute for the Blind, Deaf and Dumb in the State Board of Education, and to vest the control, possession and management thereof and of said Institute in said Board of Control, and to authorize the joint board consisting of the State Board of Education and the Board of Control, to determine as to change of location of said Institute and to do every other matter or thing in that connection necessary and requisite to carry out the purposes of said act, in violation of the Constitution of the State of Florida by which said Institute for the Blind, Deaf and Dumb is made and declared to be a public institution, jurisdiction and supervision of which is by said Constitution given to and vested in the Board of Commissioners of State Institutions; that the Florida Agricultural College was located at Lake City in said State heretofore, to-wit: in the year 1883, buildings therefor were constructed in the year 1884, and said college was opened for the reception of students, to-wit: in September, A. D. 1884, and has been in operation ever since, that the name of said college was subsequently changed to the University of Florida; that said Florida Agricultural College was permanently located at Lake City in pursuance of law for a valuable consideration, to-wit: one hundred acres of land and fifteen thousand dollars, paid, delivered and conveyed as provided by law, to-wit: to the trustees of said college as provided by law; that the college buildings were constructed on said land, and the main building was constructed with said money without cost to the State; that of the said funds so paid for the location of said college the relator F. B. Moodie

contributed a considerable amount, to-wit: four hundred and ninety dollars, and Fred L. Stringer as Trustee of the University of Florida and a member of the Board of said Institution is deprived of his said office by the said acts and doings of the said Board of Control or pretended Board of Control as hereinbefore stated; that said act, Chapter 5384, provides that if said boards shall not select the abolished institution located at Lake City as one of the places for the location of one of said institutions provided for by said act, then the said State Board of Education out of the assets and property coming to it from the said abolished institution at that place shall refund to the said City of Lake City the fifteen thousand dollars and the one hundred acres of land donated by Lake City to the said institution upon its establishment at that place; that said boards have not selected said location at Lake City as one of the places for the location of one of said institutions provided for by said act, but have located all of them elsewhere and not in Lake City, nor in the county of Columbia, in which Lake City is situated, and said City of Lake City has in interest under said act of the Legislature, Chapter 5384, in the matter of the warrant, authority and right of the said persons acting as members of the Board of Control or the State Board of Control to hold and use the said offices as aforesaid and as said Board of Control or State Board of Control to exercise, use and perform the franchises, privileges, liberties, powers and functions aforesaid.

Whereupon the said Attorney General for the said State, and in the name and by the authority thereof, prays the consideration of the court here in the premises and due process of law in this behalf to N. P. Bryan, A. L. Brown, Nathaniel Adams, P. K. Yonge and T. B. King,

to answer to the said State by what warrant or authority of law they claim to exercise offices, franchises, liberties and powers aforesaid.

> W. H. Ellis, Attorney General of Florida. A. J. Henry, Cooper & Cooper, and M. M. Scarborough, Attorneys for Relators acting by authority of said Attorney General."

On the 23rd day of November, 1905, the following amendment to the information was filed and treated as a part thereof by the respective counsel: "The defendants and their attorneys will please take notice that upon the hearing of the said cause the following grounds of unconstitutionality of the said statute of the said State, Chapter 5384, will be argued, as well as the other grounds of unconstitutionality of the said act made or raised in said information, said grounds herein specifically mentioned being:

1st. That the Legislature has attempted to delegate its legislative power to the said Boards of Education and Control in and as to each and all of the several matters and subjects covered by said act.

2nd. That said act seeks to create an office, to-wit: the office of member of the Board of Control, or State Board of Control, the incumbent of which may be removed by the Governor, contrary to the Constitution of the State under which such officers should only be removed by and with the consent of the Senate.

3rd. That the incorporation of the Florida Agricultural College into the University of the State of Florida is not contained in or covered by the title of the act.

4th. That the declaration that the property of the Florida Agricultural College is the property of the State

is not a legislative but a judicial act, and is an encroachment of the legislature upon the functions of the judiciary.

5th. That the act is a revision of all the statutes of the State on the subjects of the various schools and colleges of the State above the grade of common free schools, and does not re-enact and publish at length any of the said laws, except Section 269 of the Revised Statutes."

·On the 23rd day of November, 1905, which was the return day fixed by this court in its order granting leave to file the information, the respondents filed the following demurrer to the information, and also moved to quash the information upon the same grounds set forth in the demurrer: "Now comes N. P. Bryan, A. L. Brown, Nathaniel Adams, P. K. Yongè and T. B. King, as the State Board of Control, sought to be made respondents herein, and in obedience to the Rule issued herein to show cause, and for grounds of demurrer to the information in the nature of Quo Warranto filed herein, show as follows:

1. The office from which the said respondents are sought to be ousted is a public office essentially governmental in its character; and an information in the nature of a quo warranto to oust therefrom the incumbents thereof can be instituted only on the relation of the Attorney General.

2. The information herein has been set on foot on the relation of others than the Attorney General of the State of Florida.

3. Said information shows that it was filed by leave of this court, which has no authority to grant leave, or withhold leave, to file the same. Such an information can only be filed by the Attorney General, who in filing it must act by himself, upon his own initiative and without co-

operation with others, under his oath of office and his sense of responsibility to the sovereignty which creates the office and controls its incumbency.

4. The information assails as unconstitutional the legislative act, Chapter 5384, under which the said State Board of Control is created, and its object is to dissolve said corporation; said corporation, even if no more than a *de facto* corporation, is a necessary party herein, and is not impleaded or sought to be impleaded hereto.

5. Said information charges that respondents have wrongfully exercised and are wrongfully exercising jointly with the *State Board of Education* the power to permanently locate the University of Florida, and other institutions therein named. And yet the State Board of Education whose official action is thus sought to be impeached is not made a party to this proceeding.

6. The information does not lie because the legal existence of the office of the State Board of Control as a public office capable of being intruded into or usurped is assailed upon the sole ground that the legislative act creating it is unconstitutional; and the right of the defendants to legally exercise the functions they are charged with illegally exercising, is assailed solely upon the ground that such office as a public office does not exist.

7. The respondents herein sought to be ousted are not charged with 'intruding into or usurping a public office;' they are charged merely with 'having exercised and used without warrant of law the office and the functions and the powers of the Board of Control also known and destatute in this State enlarging the functions of an inforscribed as the State Board of Control.' And there is no mation of quo warranto, or those of an information in the nature of a quo warranto so as to embrace the acts so charged.

8. An information in the nature of a quo warranto does not lie to try the right to an office *other* than a ͵ legally recognized public office.

9. Chapter 5384 of the laws of Florida assailed as unconstitutional is not obnoxious to the constitutional provisions set forth in the information.

Wherefore, and for divers other reasons apparent on the face of said information, the said defendants demur thereto, and pray the judgment of this court that said Rule to show cause be discharged."

*A. J. Henry, Cooper & Cooper,* and *M. M. Scarborough, Jr.,* for Relator.

*A. W. Cockrell & Son, H. H. Buckman* and *Fred. T. Myers,* for Respondents.

SHACKLEFORD, C. J., *(after stating the facts.)*  The first eight grounds of the demurrer interposed by the respondents to the information attack the form thereof and question whether or not the same has been properly brought or will lie.  Our attention has been called by the respective counsel to a number of authorities bearing upon these grounds and we have had the benefit not only of carefully prepared briefs relating thereto but of elaborate oral arguments as well.  Although these points are replete with interest and we appreciate the able and thorough manner in which they have been presented to us by the respective counsel, we have determined that no extended discussion thereof by us is either advisable or necessary, especially so since counsel for the respondents, while raising and strenuously arguing these points of practice and procedure, have requested us in the event the act is sustained

State ex rel. Atty. General v. Bryan et al.——Opinion of Court.

to render a decision upon the merits of the case, and for the further reason that an examination of these points has led to an investigation of the entire case presented by the record, and as it has been argued by counsel, and we have reached a conclusion thereon, therefore we have decided to dispose of the case on its merits, with only a brief reference to these preliminary matters. Jacksonville Electric Light Co. v. City of Jacksonville, 36 Fla. 229, text 262, 18 South. Rep. 677, S. C. 51 Am. St. Rep. 24, 30 L. R. A. 540.

As we said in our Advisory Opinion to the Governor, 49 Fla. 269, 39 South. Rep. 63, text 64, "The duties to be performed by such board (the State Board of Control) are important and essentially governmental in character. The office is continuous and permanent, and remains to be filled, though the incumbents may die or resign." It necessarily follows, then, as was said by this court, speaking through Mr. Justice WESTCOTT, in the very able and exhaustive opinion rendered by him in State v. Gleason, 12 Fla. 190, text 224 *et seq.*: "An information in the nature of a *quo warranto* may be filed at the discretion of the Attorney General in a case of this character. The proper process 'issues on demand of the proper officer of the State, as a matter of course, and there is no more necessity for an application to this court for this writ than there would be for a summons in a Circuit Court when the State is about to commence an action of debt against one of her debtors. No reasons are offered why the writ should issue, no information is communicated by affidavit or otherwise, and there is no power in this court to refuse issuing the writ. Why ask leave? It is the admission that this court has a discretion, whereas none is conceived to exist.' 8th Missouri, 331.

Under the laws of this State, the Attorney General is as much the representative of the State of Florida in the Supreme Court, as the King's Attorney General is his representative in the Court of King's Bench; indeed, more so, as in the Court of King's Bench there are for certain causes representatives of the King's other than the Attorney General; while here, it is his sole duty to 'appear in and attend to, in behalf of the State, all suits or prosecutions, civil or criminal, or in equity, in which the State may be a party, or in anywise interested, in the Supreme Court of this State.' Acts of 1845, page 5.

The office of Attorney General is, in many respects, judicial in its character, and he is clothed with a considerable discretion. The appropriate and proper function of courts is to hear causes that the citizens of the State may see proper to institute, and there are but few cases in which they can exercise a discretion to refuse to hear them. The Attorney General being intimately associated with the other departments of the Government, being as well the proper legal adviser of the Executive as the Legislative department of the Government, it is highly proper, whenever the right to a public office is to be tried, that he should be clothed with a discretion in the premises which should be exercised at least independently of the courts in actions of this character. A careful review of the cases in the books will show that the records disclose that in almost every case of this kind there is more or less political feeling, and the case at bar discloses no less, and indeed much more, of this than is usual. Is it to be said that it is a function appropriate to a court to weigh the motives of contending political factions, examine into their various political theories, attempt to enter into their breasts, and determine motives? Are they to measure with microscopic analysis, and ascertain whether there

is passion and prejudice, and after ascertaining that there is, to fix by judicial determination just how much of each, or either, or both, is necessary to remove a case from judicial scrutiny?

The court cannot criticize the motives of a party acting as an officer; it may, in some cases, exercise a discretion where a relator clothed with no official discretion asks its aid. In him are vested no public rights, no governmental discretion, and he seeks a judicial tribunal as an individual, and should not be permitted to inquire into rights to franchise unless the public good is promoted thereby.

This discretion is vested in the Attorney General; if he exercises it improperly, there is another tribunal, the people, or their grand inquest, the Assembly, to punish him." Also see Robinson v. Jones, 14 Fla. 256; State v. Jones, 16 Fla. 306; Lake v. Palmer, 18 Fla. 501, text 506, *et seq.;* State v. Anderson, 26 Fla. 240, text 251, *et seq.,* especially 253, 8 South. Rep. 1; Buckman v. State, 34 Fla. 48, text 56 *et seq.,* 15 South. Rep. 697, S. C. 24 L. R. A. 806.

The statutes now in force relating to the institution of proceedings upon writs of *quo warranto* in this State are found in the Revised Statutes of 1892, and are as follows:

"1781. Power of court to make parties.—In all proceedings upon writs of *quo warranto,* or upon information in the nature of such writs, or in civil actions instituted to obtain the remedies obtainable by such proceedings, where the Attorney General institutes the action and does not make all the persons claiming title to the office parties, it shall be within the power of the court to make parties defendant of all persons claiming the office and not made parties by the Attorney General. But the said persons so desiring to be made parties shall be required to set forth by petition under oath a *prima facie* case of right and title to the office before the court can be re-

quired to make the order, and to give security to the satisfaction of the court for the payment of all costs which may be awarded against them.

1782. Right of claimant upon refusal of Attorney General.—Any person claiming title to an office which is exercised by another shall have the right, upon refusal by the Attorney General to institute proceedings in the name of the State upon such claimant's relation, or upon the Attorney General's refusal to file a complaint setting forth his name as the person rightfully entitled to the office, to file an information, or institute an action in the name of the State against the person exercising the office, setting up his own claim. In this case, the court is authorized and required to determine the right of the claimant to the office if he so desires. However, in this as well as in all other proceedings of this character, no person shall be adjudged entitled to hold an office except upon full proof of his title to the office."

It is unnecessary for us to discuss the changes which have been made in our statutes since the opinion in Gleason v. State, *supra,* was rendered. Suffice it to state, as was said by this court in State v. Anderson, *supra,* text 251, in referring to the case of Gleason v. State, *supra,* "There is nothing in our jurisdiction as defined by the present Constitution (1885) that renders the above decision inapplicable or without controlling authority now." We would add that none of the changes made in our statutes since that decision was rendered have lessened or impaired its force or applicability upon the points now under consideration. It still remains not only the leading case in this court upon the subject of proceedings upon writs of *quo warranto,* but as was admitted by the respective counsel, if we understood them correctly, one of the leading cases in the

United States. It is, then, the settled law in this State, as it was at common law, that "an information in the nature of a *quo warranto* may be filed at the discretion of the Attorney General in a case of this character," and that "there is no more necessity for an application to this court for this writ than there would be for a summons in a Circuit Court when the State is about to commence an action of debt against one of her debtors." State v. Gleason, *supra,* text 224, 225; State v. Anderson, *supra,* text 253. "This discretion is vested in the Attorney General; if he exercises it improperly, there is another tribunal, the people, or their grand inquest, the Assembly, to punish him." State v. Gleason, *supra,* text 226.

Upon the Attorney General, then, rests the responsibility for the filing of this information, for its form, nature and contents, including all of its allegations. This authority and responsibility so vested in him cannot be delegated by him to any person or persons, or even cast upon this court. See Shortt's Informations, Mandamus and Prohibition, Amer. Ed. by Heard, star pages 112 *et seq.* and authorities cited in notes; 23 Amer. & Eng. Ency. Law (2nd ed.) 601 *et seq.* and authorities cited in notes; 17 Ency. of Pl. & Pr. 428, 441, 442, 444, 448, and notes; High's Extraordinary Remedies (3rd ed.) Section 697, and notes; 1 Spelling's Injunctions and Other Extraordinary Remedies (2nd ed.) Sections 1834 *et seq.* and notes. It would seem that the proper practice in a proceeding of this character is to institute it in the name of the State upon the relation of the Attorney General. Gleason v. State, *supra.*

The requirement in section 37 of Article 5 of the Constitution of 1885, being in substance the same as the one in force at the time the decision in Gleason v. State, *supra,*

23 S. C.

was rendered, is as follows: "The style of all process shall be 'The State of Florida,' and all prosecutions shall be conducted in the name and by the authority of the State." We shall treat this information as brought in the name of the State upon the relation of the Attorney General, though in a somewhat informal manner, considering the mention of the so-styled relators as mere surplusage and in no way affecting the validity of the information, nor in any way affecting the absolute control of the case by the Attorney General in his official capacity. See Shortt's Information, Mandamus and Prohibition, Amer. Ed. by Heard, star page 112, note 1; Commonwealth v. Fowler, 10 Mass. 290; Goddard v. Smithett, 3 Gray (Mass.) 116; Commonwealth v. Allen, 128 Mass. 308; Attorney General v. Adonai Shomo Corp. 167 Mass. 424, 45 N. E. Rep. 762; High's Extraordinary Remedies (3rd ed.) Sections 697, 703; 17 Ency. Pl. & Pr. 462.

Assuming, then, without further discussion and without passing upon the points raised by the first eight grounds of the demurrer, that the proceedings in the instant case have been properly instituted and that the information is in sufficiently proper form to warrant our consideration of the case on its merits, for the reasons already stated, without more ado, we pass to the consideration of the merits.

The ninth and only remaining ground of the demurrer is that "Chapter 5384 of the laws of Florida assailed as unconstitutional is not obnoxious to the constitutional provisions set forth in the information."

This brings us face to face with the act in question and we must determine whether or not it is sufficient to withstand the attack made upon it in the information and the amendment filed thereto and treated by the respective counsel as forming a part thereof. This we shall now

proceed to do, taking up for consideration the grounds of attack upon the constitutionality of said act in the order in which they appear in the information and the amendment. Before doing this, however, it may be well for us to remember and bear in mind throughout this discussion that "No rule of constitutional construction is better settled than that if there be a doubt whether a legislative enactment is strictly constitutional, or that if it be not clearly opposed to constitutional restrictions, the courts will not hold the enactment to be invalid. If the courts were to hold otherwise they would become mere lawmakers, undertaking to place obstacles in the way of legislation which had not been plainly placed there by the people in framing the Charter itself, and deny to the people represented in the Legislature a power they had not denied to the legislative department." Cheney v. Jones, 14 Fla. 587, text 607. As was said in Holton v. State, 28 Fla. 303, 9 South. Rep. 716, 2nd head-note, "A liberal rule of construction should be applied when the constitutionality of legislative enactments is questioned; and every reasonable doubt should be resolved in favor of the constitutionality of the act assailed." Also, as was said in State ex rel. Turner v. Hocker, 36 Fla. 358, text 363 et seq. 18 South. Rep. 767, "In passing upon the constitutionality of statutes generally, no matter from what standpoint the attack thereon may be made, it is a well-settled and cardinal rule that nothing but a clear violation of the Constitution will justify the courts in overruling the legislative will; and where there is a reasonable doubt as to the constitutionality of an act it must be resolved in favor of the act, and it should be upheld. It is further well-settled that constitutional provisions for the government of the legislative department in the enactment of laws, like those quoted above, are *mandatory*, and that it is the

duty of the courts to adjudge the law invalid and void in cases where it is clear, beyond reasonable doubt, that these provisions have been violated or ignored; but these provisions should receive, not a technical construction, but a reasonable one; and looking to the evils intended to be remedied thereby, only such legislative acts should be overthrown as are clearly and obviously offensive in their spirit and meaning. See the numerous cases cited in the notes to Davis v. State, 61 Amer. Dec. 331." Also see to the same effect County Commissioners of Duval County v. City of Jacksonville, 36 Fla. 196, 18 South. Rep. 339, 29 L. R. A. 416; State v. Canfield, 40 Fla. 36, 23 South. Rep. 591, 42 L. R. A. 72; Webster v. Powell, 36 Fla. 703, text 715, et seq., 18 South. Rep. 441; State ex rel. Attorney General v. Burns, 38 Fla. 367, text 388, 21 South. Rep. 290.

Having before us these principles, which must guide us in our investigation and determination, we now turn to the grounds of objection urged against the constitutionality of the act in question, and, as a matter of convenience, we shall number the grounds and divide them into separate sections.

## I.

The first ground alleged in the information against the constitutionality of the act in question is as follows: "That the said act is in violation of the constitution of the State of Florida and the constitution of the United States and is void and of no effect and confers no powers, functions, franchises or privileges upon them (the officers named in the information) for that by act of Congress of July 2, 1862, the funds for the establishing and maintenance of the Florida Agricultural College was donated

by the government of the United States for the certain purpose therein expressed as follows, to-wit: 'to teach such branches of learning as are related to agriculture and the mechanic arts, without excluding other scientific and classical studies and including military tactics in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions of life.' And the act of the legislature, Section 279 of the Revised Statutes of Florida in words accepted said donation for the same purpose; and for that the contract then and there and thereby entered into by and on the part of the State of Florida with the Government of the United States and the act of Congress upon the subject, which is the supreme law of the land, requires the said State to use the said funds for the maintenance of a college of the class expressed in the words and terms of the contract created in the transaction of the said donation and acceptance and according to the terms of the act of Congress; whereas under the requirements of the said act of the legislature, no student can be admitted to said Agricultural College except those who have passed a satisfactory examination at some high school, and through the twelfth grade as now established, or some other institution of learning having an equivalent of instruction to the twelfth grade, which excludes the persons and classes for whom said provision of said act of Congress was made. So that the said act is void as impairing the obligation of the contract and as conflicting with the said act of Congress."

The act of Congress referred to in the above quotation from the information is found in Vol. 12 of U. S. Statutes at Large, 503, *et seq.*, 2 Fed. Stats. Annotated, 850 *et seq.*, but we deem it unnecessary to copy this act here for the

reason that the same was extensively discussed by this court in State *ex rel.* Attorney General v. Knowles, 16 Fla. 577, as was also Chapter 1766 of the Laws of Florida of 1870, of which Chapter section 279 of the Revised Statutes of Florida, of 1892 formed a part. In the statement and opinion in this case a full history of what was done under this Act of Congress by the State of Florida, including all the amendments to Chapter 1766 adopted by the Legislature of Florida is set forth, and as to these matters we content ourselves by referring to said cited case. There, as in the instant case, the constitutionality of the Act of the Florida Legislature then in force in regard to The Florida Agricultural College was assailed largely upon the same grounds which form the basis of attack in the instant case. In the opinion rendered therein by Mr. Justice WESTCOTT it was held that Chap. 3045 of the Laws of 1877, which amended Chap. 1766 of the Laws of 1870, was not unconstitutional, and the following language on page 616 *et seq.* was used by him: "The next general proposition as to this statute is that it impairs the obligation of a contract. The statute changes the trustees of this college. It substitutes the trustees named in the act of 1877 for those named in the act of 1872, as the act of 1872 substituted those named in it for those mentioned in the act of 1870. The ground upon which this view is based is that this is a private not a public corporation. The corporation is itself founded by the State through property derived from the government of the United States. These trustees are made by this legislation the agents of the State to collect and disburse property appropriated by the General Government to the State for a public purpose.

There is not and never was any private property in the

trustees in the funds. .They were derived from the government. The founder of this institution was the government of the State of Florida, and the property which constituted its basis was public moneys of the State of Florida derived by it from the government of the United States in trust for the establishment of an institution of this character.

It never was the purpose of the State of Florida to give these trustees any private right to this property. Throughout the whole legislation they are shown to be simple public agents to manage a public property. The only right they have to it is by the legislation of the State, and every section of these acts shows that it was founded by public funds and for a public purpose. 5 Stew. & Port., 23 ; 4 Wheat., 518.

It may be true that any legislation of the State appropriating these funds to any other purpose than that public purpose named in the act of Congress, might have been in bad faith, but that is a matter which does not concern these trustees, nor does this fact change the nature of the institution."

It will be borne in mind that the cited case was, as is the instant case, a *quo warranto* proceeding.

We are of the opinion that there is no force in this objection and that it is without merit. It is not pointed out to us in what manner any of the provisions of the act assailed as being unconstitutional defeats the purpose of the act of Congress. It is not charged directly in the information that any students have been or will be deprived of the right to receive the benefits of a college education contemplated by the act of Congress, the title of which act is "An Act donating Public Lands to the Several States and Territories which may provide Colleges for the

Benefit of Agricultural and the Mechanic Arts." It surely cannot be seriously contended that the Legislature has not the right to provide proper educational qualifications for admission to the college so created by the Legislature under the provisions of this act of Congress. Undoubtedly some judgment and discretion were to be used by the Legislature in prescribing these qualifications, otherwise how could the institution in question be a college? As a matter of fact, the Legislature in Section 15 of Chapter 1766 of the Laws of 1870, brought forward into the Revised Statutes of 1892 as section 293, relating to the Florida Agricultural College, expressly conferred upon the *faculty* thereof the authority to *"determine the basis of admission"* to the college, thereby recognizing the fact that all pupils, regardless of age or qualifications, were not entitled to admission. This provision has never been called in question, so far as we are informed, but has been silently acquiesced in ever since its enactment. If the faculty could be left by the Legislature unrestricted in determining "the basis of admission," why could not the Legislature itself fix this basis, as it did in the act in question? Congress certainly did not intend that a State accepting the provisions of the act and establishing a college thereunder should admit thereto any children who saw fit to apply, whether in the kindergarten, primary or whatsoever department, in default whereof the contract so made between Congress and the State would be impaired and the act of Congress thereby violated. To so hold would be an utter absurdity, and yet the contention of the relator logically leads to this *reductio ad absurdum.* But this is not all. On turning to Chap. 1 of Title 5 of the Revised Statutes of 1892, embracing sections 225 to 267 inclusive, to say nothing of the various acts amendatory that have been enacted into

laws since the adoption of the Revised Statutes, we find that the State of Florida has made most ample and liberal provisions for her public schools, so that every child within her borders has the opportunity of receiving full and adequate preparation for admission to the University of the State of Florida created by Chapter 5384 of the Laws of 1905, which act is here assailed as being unconstitutional. Also see Chapter 5206 of the Laws of 1903, being entitled "An Act to Define the Grades of Instruction which shall be Taught in the Uniform System of Public Schools of Florida, to Aid and Encourage the Establishment of Public High Schools and Rural Graded Schools, to Prescribe Conditions, Provide for Inspection, and to Make Appropriations Therefor." We would further refer to Chapters 5381, 5382, and 5383 of the Laws of 1905, immediately preceding Chapter 5384. A mere reading of these laws will prove convincing that the State, acting through her legislative arm, is endeavoring to aid in every possible way the design contemplated by the cited act of Congress, "to promote the liberal and practical education of the industrial classes in the several pursuits and professions of life." Wherein the act in question is "void as impairing the obligation of the contract and as conflicting with the said act of Congress" we utterly fail to see.

Even if it be assumed that students below the twelfth grade as mentioned in the assailed law have a legal right to admission to the University of the State of Florida, which, however, has not been made to appear to us, that right could be enforced by appropriate proceedings, notwithstanding the provisions of the act in question upon the subject, and the provisions so contained in the act could not make the entire act unconstitutional or void.

See Hart v. Bostwick, 14 Fla. 162, text 171; *Ex parte* Pitts, 35 Fla. 149, 17 South. Rep. 76; State *ex rel.* Attorney General v. Dillon, 32 Fla. 545, 14 South. Rep. 383, 22 L. R. A. 124; English v. State, 31 Fla. 340, 12 South. Rep. 689; Donald v. State, 31 Fla. 255, 12 South. Rep. 695; State *ex rel.* Moody v. J. T. & K. W. Ry. Co., 20 Fla. 616.

We would also call attention to the case of State v. The Vicksburg & Nashville R. R. Co., 51 Miss. 362, wherein that court had occasion to pass upon and construe certain acts of the Legislature of that State dealing with proceeds derived from the sale of lands donated to the State by the act of Congress of 1862, which is the act with which Chapter 5384 is said to conflict in the instant case. In the opinion rendered in the cited case the court said, page 366, in speaking of the investment to be made of the trust fund derived from the sale of the lands, "The discretionary power of the legislature over the subject is full. The foregoing observations are applicable in the main as respects the college, or colleges that may become the beneficiaries. The legislature is free to establish one or more colleges of the character described in the act of Congress, and make them the recipients of the interest for their support, or it may, as it has done, bestow it upon the universities. These universities are public eleemosynary corporations, which dispense the bounty of the State, their founder, to such persons as it directs. They were created by the State, and are supported by public funds, and are instrumentalities in the scheme of education. Both of them are subject to change and modification by the legislature. Against the State, neither of them can set up a vested right to property, or corporate franchises. Their governing boards are appointees of the State without

right or power to continue the succession. The State could withdraw the interest of the fund from them, and found another institution and make it the recipient of it." This opinion is instructive upon several points in the instant case and we shall have occasion to refer to it again.

## II.

The second ground of unconstitutionality stated in the information is: "That the said act impairs the obligation of the contract of the State of Florida with the people who donated to the Board of Trustees of the Florida Agricultural College who were agents of the State for the purpose of locating said college, $15,000 and one hundred acres of land in consideration of the location of the Agricultural College at Lake City, as hereinbefore mentioned in that the said act provides for the removal of the Florida Agricultural College from Lake City without any cause for such removal, and also takes from them their property in the premises without due process of law."

We are of the opinion that there is even less merit in this specification than in the first objection, which we have just discussed, and a part of what we said there has equal applicability here. The quoted extract from the able opinion of Mr. Justice SIMRALL in State v. The Vicksburg & Nashville R. R. Co., *supra,* is especially in point. Also, as was well said by counsel for the respondents, "The existence of a contract is essential to its obligation, and, if there be no contract, there is no obligation of it to be violated." See 8 Cyc. 991; Lobrano v. Nelligan, 9 Wall. 295; Bryan v. Board of Education of the Kentucky Conference of the Mehthodist Episcopal Church, South, 151 U. S. 639, 14 Sup. Ct. Rep. 465. Also see the

excerpt quoted above from State *ex rel.* Attorney General
v. Knowles, 16 Fla. 577, text 616 *et seq.*, which also seems
to us to be directly in point. We quote further from page
617 in that opinion, "It is insisted that the obligation of
a contract with W. H. Gleason is impaired by the act of
1877, in that it directs a removal of the college. This
question is entirely independent of the question raised in
this case, which is the right of the trustees to hold and
exercise a public trust against the provisions of a statute
naming other persons trustees in their stead. Because
they have made a contract with some one else cannot ex-
tend their powers or rights.

The question whether a city or town has made a contract
with A, B or C is entirely distinct from the question
whether the Legislature may not change the affairs of a
public municipal corporation.

What has been said disposes of the further objection,
on the ground that these respondents are deprived of their
property without due process of law."

We also find from the statement and opinion in the
cited case that, under Chapter 1766 of the Laws of 1870,
and the act supplementary thereto being Chapter 1905 of
the Laws of 1872, certain persons named therein as trus-
tees of the Florida Agricultural College were empowered
and authorized, among other things, to "determine upon
the location of the college at some healthy and conven-
iently accessible point, which location shall be as near the
centre of the State as possible;" in accordance with sec-
tion 10 of Chapter 1766, the trustees proceeded to com-
plete the organization and establishment of the college
and to select a site for the location of the college build-
ings. "To this end they advertised for propositions from
different localities desiring the location of the college for

contributions to aid in its construction, and received from Wm. H. Gleason an offer of over two thousand acres of land, situate at Eau Gallie, on condition that the college should be permanently located at that place. The trustees accepted this offer, and a contract was made with Mr. Gleason, by which the land was conveyed to the college, and the location of the college was fixed at Eau Gallie, where the trustees commenced the construction of buildings." Chapter 3045 of the Laws of 1877 "provided for a change of the entire management and control of the Florida State Agricultural College, by removing the trustees or directors created by Chapter 1905, and substituting others in their stead; and also a change of the organization of the officers and committees, and the removal of the college from Eau Gallie, where it had been located under the contract with Mr. Gleason." See especially section 4 of Chapter 3045 of the Laws of 1877, which reads as follows:

"Sec. 4. *It is hereby further enacted,* That the said Board of Trustees provided for and established by this act shall have power to remove said Agricultural College, now located at Eau Gallie, on Indian River, in Brevard county, to any point that in their judgment will be for the best interests of the State of Florida; *Provided,* That the point which may be selected for its location shall be easily accessible and as near the centre of the State as practicable."

Under and by virtue of the power and authority conferred upon them by Chapter 3045, which act was held constitutional in the cited case, the new trustees proceeded to remove the Florida Agricultural College from Eau Gallie and to locate the same at Lake City. Section 289 of the Rev. Stats. of 1892, simply provides that "The college shall remain at its present location unless the

same be changed by statute," the "present location" not being named therein.

If any contract was made and entered into by the municipality of Lake City or by certain people who donated to the Board of Trustees of the Florida Agricultural College $15,000 and one hundred acres of land, in consideration of the location of said college at that point, this contract must have been made with the *Trustees,* and it would seem that what was said by this court in the cited case of State *ex rel.* Attorney General v. Knowles, *supra,* disposes of this second objection to the constitutionality of Chapter 5384 adversely to the contention of the relator.

However, putting the most favorable construction possible upon the contention of the relator which forms the basis for this second objection, and *assuming* that a contract was made by the State of Florida, whether acting through the Legislature or the Trustees of the College, with said municipality or the donators, in order to secure the location of the college at Lake City, then what follows? What kind of right are involved, public or private? If the latter, as would seem to be the case, then *quo warranto* is not the proper remedy for the trial of exclusively private rights. It is available only where the public, in theory at least, have some interest. 23 Amer. & Eng. Ency. Law (2nd ed.) 610, and authorities cited in note 6.

The opinion rendered by this court in Florida, C. & P. R. Co. v. State *ex rel.* Town of Tavares, 31 Fla. 482, 13 South. Rep. 103, 34 Amer. St. Rep. 30, 20 L. R. A. 419, is in point. That case was brought to this court by writ of error to a judgment of the Circuit Court awarding a peremptory writ of mandamus requiring the plaintiff in error to locate its depot at a particular point in the town of Tavares. In the opinion rendered therein we said,

page 508, "There is no better settled elementary principle in the law of mandamus than that the writ will never lie to enforce the performance of private contracts." We also quoted and approved the following language from Marsh v. Fairbury, Pontiac and Northwestern Railway Company, 64 Ill. 414: "The location of railroad depots has much to do with the accommodation of the wants of the public. And when once established, a change of affairs may require a change of location, in order to suit public convenience. We cannot admit that an individual is entitled to call for the interference of a court of equity to compel a railroad company to locate unchangeably its depot at a particular spot to subserve the private advantages of such individual. Railroad companies, in order to fulfill one of the ends of their creation—the promotion of the public welfare—should be left free to establish and re-establish their depots wheresoever the accommodation of the wants of the public may require. To grant the relief asked for by the complainant, we would regard as against public policy."

We further quoted and approved the following from People ex rel. v. Chicago & Alton R. R. Co., 130 Ill. 175: "It is in recognition of the paramount duty of railway companies to establish and maintain their depots at such points, and in such manner, as to subserve the public necessities and convenience, that it has been held by all the courts, with very few exceptions, that contracts materially limiting their power to locate and re-locate their depots, are against public policy, and therefore void."

Also see the other quotations and authorities cited in the opinion.

With how much more force does this reasoning apply in the instant case. If the Legislature had the power to appoint trustees and authorize them to change the location

of the college previously established at Eau Gallie, under a contract made with Wm. H. Gleason to locate said college *permanently* at that point and to remove it to any point that, in their judgment, would be best for the interest of the State, why might not a subsequent Legislature appoint other trustees and confer a like power upon them? If Chapter 3045 of the Laws of 1877 was not unconstitutional for that reason, how can we hold Chapter 5384 of the Laws of 1905 to be unconstitutional, when a like attack is made upon it? Surely if the Florida Agricultural College, or the University of Florida, to call it by its name as changed by Chapter 5272 of the Laws of 1903, is a public institution, it is subject to legislative control as other public institutions, and the State in legislating concerning it is but dealing with its own property in the way that will in its judgment best subserve public interests. Moreover, actuated by a spirit of fairness toward the donors, who had made contributions of land and money in order to secure the location of the college at Lake City, the Legislature expressly provided in Chapter 5384, that in the event none of the institutions of learning created thereby should be located at Lake City, the State Board of Education should refund to the City of Lake City the fifteen thousand dollars and the one hundred acres of land so donated by it.

We deem further discussion of this objection superfluous, and so pass to the third objection urged.

### III.

The third ground of unconstitutionality urged is: "That it is provided by Section 1, Article 3 of the Constitution of the State that the legislative authority of the State shall be vested in a Senate and a House of Represen-

VOL. 50, JUNE TERM, 1905.          369

State ex rel. Atty. General v. Bryan et al.—Opinion of Court.

tatives which shall be designated the Legislature of the State of Florida; whereas in and by the said act the Legislature has attempted to delegate its powers of making laws in the matter of the removal of the said Florida Agricultural College and the location of the University thereby created; the said institutions having been located by law. Section 289, Revised Statutes of Florida."

We have already practically disposed of this objection in discussing the second objection.

It is true, as we have said and is contended by the relator that section 289 of the Revised Statutes of 1892, provides that the Florida Agricultural College shall remain at its present location unless the same be changed by statute. This location, as we have seen, had been fixed by the trustees at Lake City, as its previous location had been fixed by former trustees at Eau Gallie. Chapter 3045 of the Laws of 1877 had appointed other trustees and empowered them to remove the college "to any point that in their judgment will be for the best interests of the State of Florida; provided, that the point which may be selected for its location shall be easily accessible and as near the centre of the State as possible." Acting under the authority so vested in them by said Chapter the trustees appointed therein, in the exercise of their judgment and discretion, located the college at Lake City, and, in that way Lake City secured the location of the college. If Chapter 3045 of the Laws of 1877 was held to be constitutional, as it was by this court in State *ex rel.* Attorney General v. Knowles, *supra,* how can we hold Chapter 5384 of the Laws of 1905 unconstitutional because it authorizes and empowers the State Board of Control created thereby and the State Board of Education, at a meeting of both of said boards to be held in joint session at the Capital, to

24 S. C.

370        SUPREME COURT OF FLORIDA.

State ex rel. Atty. General v. Bryan et al.—Opinion of Court.

determine the place of location of the University of the State of Florida? If the former act was constitutional, why is not the latter? Said Chapter 5384 expressly repeals section 289 of the Revised Statutes of 1892. It cannot be successfully contended that the Legislature did not have the power to repeal this section. In fact, the section so repealed expressly provides that the location of the college might be changed by statute. Is not Chapter 5384 a statute? While it does not undertake to designate the location of the University of the State of Florida, created thereby, as undoubtedly might have been done therein by the Legislature, we fail to see wherein it is rendered unconstitutional by the delegation of the selection of the location to the two Boards named therein.

As was said by this court in Ex-Parte Wells, 21 Fla. 280, text 323, "We do not mean to admit by what we have said that it is 'always essential that a legislative act should be a completed statute which must, in any event, take effect as a law at the time it leaves the hands of the legislative department. A statute may be conditional and it may be made to depend upon a subsequent event'." Also see the discussion therein as to the discretion vested in the Governor by certain acts of the Legislature which were attacked as being unconstitutional. We refer also to Railroad Commissioners v. Pensacola & A. R. Co., 24 Fla. 417, text 471 et seq., 5 South. Rep. 129, 12 Amer. St. Rep. 220, 2 L. R. A. 504, and Storrs v. Pensacola & A. R. Co., 29 Fla. 617, text 620 et seq., 11 South. Rep. 226, as throwing light upon the delegation of certain powers by the Legislature, in the matter of regulating rates, to the Railroad Commissioners. The following authorities may also prove instructive upon this point: Cooley's Constitutional Limitations (7th ed.) 164 et seq., and authorities cited in notes; People v. Dunn, 80 Cal. 211, 22 Pac. Rep.

140; Field v. Clark, 143 U. S. 649, 12 Sup. Ct. Rep. 495; The Cargo of the Brig Aurora v. United States, 7 Cranch (U. S.) 382; Territory *ex rel.* Smith v. Scott, 3 Dak. 357, 20 N. W. Rep. 401; Advisory Opinion, 138 Mass. 601; Hildreth v. Crawford, 65 Iowa 339, 21 N. W. Rep. 667; The Governor v. McEwen, 5 Humph. (Tenn.) 241; Matter of New York Elevated R. R. Co., 70 N. Y. 327; People v. Harper, 91 Ill. 357; Hurst v. Warner, 102 Mich. 238, 60 N. W. Rep. 440; Stone v. Farmers' Loan & Trust Co., 116 U. S. 307, 6 Sup. Ct. Rep. 334, 388, 1191; 8 Cyc. 830 *et seq.*, especially 833 and authorities cited in note 96. We think it clearly apparent from an examination of the foregoing cited authorities, to say nothing of the numerous others to which we have referred, that the Legislature has not delegated or attempted to delegate its legislative powers to the two Boards, as urged in the objection we are now considering. If the act in question be unconstitutional for the reasons urged in this objection, it necessarily follows that many other laws which have been enacted, some of which have been on the statute books for many years, are unconstitutional for like reasons. To mention only a few, we refer to section 769 of the Revised Statutes of 1892, Chapter 4348 of the Laws of 1895, conferring certain powers upon the State Board of Health; certain sections of Chapters 4 and 5 of Title II of the Revised Statutes of 1892, and the various amendments thereof, conferring certain powers upon the boards of medical examiners and pharmacists mentioned therein; Section 429 of the Revised Statutes of 1892, originally enacted in 1855, conferring certain powers upon the Trustees of the Internal Improvement Fund; Chapter 4893 of the Laws of 1901, creating and conferring certain powers upon the "Capitol Improvement Commission," Chapter 5472 of the Laws of 1905 creating and conferring certain powers upon

the "Governor's Mansion Commission;" Section 15 of Chapter 1766 of the Laws of 1870, brought forward into the Revised Statutes of 1892 as section 293, relating to the Florida Agricultural College empowering the faculty thereof to "determine the basis of admission, the length of complete and partial courses of study, the studies to be pursued, and the text books used," &c. Still other acts could be added to the foregoing, but we have referred to a sufficient number to serve our purpose.

## IV.

We now come to the fourth ground of unconstitutionality alleged in the information, which is: "That in the said act of Congress donating to the State the said fund for the establishment and maintenance of the Florida Agricultural College, and in the act of the Florida Legislature accepting the same, it is provided that military tactics shall be taught in the said college; and whereas in and by the said act of the Legislature, Chapter 5384, it is provided that military tactics shall only be taught in the University, including the Agricultural College, in the event it shall be so determined by the said joint board therein mentioned."

This need not detain us long. While it is true as was held in Minneapolis Brewing Co. v. McGillivray, 104 Fed. Rep. 258, cited by the relator, that "The constitutionality of a statute is not determined by what has been actually done thereunder, but by what may be done by virtue of its provisions," yet the facts in the instant case are so unlike those in the cited case as to render the latter of but little applicability, as an examination of the cited case will show. We shall not take the time to discuss the points of difference. While section 2 of Chapter 1766 of

the Laws of 1870, section 2 of Chapter 1905 of the Laws of 1872, section 1 of Chapter 3045 of the Laws of 1877 and section 279 of the Revised Statutes of 1892, in speaking of "the design" of the Florida Agricultural College, all refer to the teaching of "military tactics" therein, yet, as we have already seen, section 15 of Chapter 1766 of the Laws of 1870, brought forward into the Revised Statutes of 1892 as section 293, confers upon the faculty the power of determining, among other things, "the studies to be pursued" therein. Section 21 of Chapter 5384 of the Laws of 1905 prescribes certain departments which the University of the State of Florida shall have and contain, "and such other departments as may from time to time be determined upon and added at any joint meeting of the State Board of Education with the said Board of Control," then contains the further provision, "and shall include military tactics if the said joint Boards shall deem the same requisite and proper." How this last quoted clause can render the act unconstitutional we are at a loss to understand. There is no allegation or even intimation in the information that the joint boards have determined that military tactics shall not be taught in the institution or that they contemplate so deciding. Even if they should so decide, we do not well see how the State could raise the question, especially in a *quo warranto* proceeding. The reasoning in State v. The Vicksburg & Nashville R. R. Co., 51 Miss. 361, text 366 *et seq.,* is applicable, though in that case the proceeding was by bill in chancery. Also see State *ex rel.* Attorney General v. Knowles, *supra,* text 616 *et seq.;* Emigrant Company v. County of Adams, 100 U. S. 61; Mills County v. Railroad Companies, 107 U. S. 557, 2 Sup. Ct. Rep. 654; Hagar v. Reclamation Dist. No. 108, 111 U. S. 701, 4 Sup. Ct. Rep. 663.

State ex rel. Atty. General v. Bryan et al.—Opinion of Court.

However, be this as it may, if it is the legal duty of the State, whether acting through the Legislature directly, through the two joint boards named in the act, or through the faculty of the institution, to require military tactics to be taught therein, this duty can be enforced by appropriate proceedings, instituted by a prospective student desiring instruction in military tactics against the proper parties, and the provisions complained of in the objection under consideration cannot affect the validity of the entire act. See authorities already cited by us near the close of division 1 of this opinion.

## V.

The fifth ground of unconstitutionality alleged against the act is: "That in and by the Constitution of the State of Florida the disqualification of persons for office in said State and the power of the legislature to enact laws excluding persons from offices in said State are prescribed and limited; but it is provided in and by the said act, Chapter 5384, that the Board of Control therein and thereby provided for shall consist of five citizens of the State; one from East Florida, one from South Florida, one from West Florida, one from Middle Florida and one from Middle South Floirda, who shall have been residents and citizens thereof for a period of at least ten years prior to their appointment; and that no member of said first Board should be appointed from any county in which any of the institutions named in said act were located, and no appointment upon such board shall ever be made from any county in which an institution created by the act may or might be located or situated, which provisions are contrary to and in violation of the constitution of said State."

This ground is strenuously and ably argued by the relator, but it seems to us that, subjected to a rigid analysis, it has only a semblance of force. The provisions of the Constitution which it is contended in the argument in support of this ground are violated by the act in question are section 27 of Article 3 and section 5 of Article 6, which read as follows:

"Section 27. The legislature shall provide for the election by the people or appointment by the Governor of all State and county officers not otherwise provided for by this Constitution, and fix by law their duties and compensation."

"Section 5. The legislature shall have power to, and shall enact the necessary laws to exclude from every office of honor, power, trust or profit, civil or military, within the State, and from the right of suffrage, all persons convicted of bribery, perjury, larceny, or of infamous crime, or who shall make or become directly or indirectly interested in, any bet or wager, the result of which shall depend upon any election; or that shall hereafter fight a duel or send or accept a challenge to fight, or that shall be a second to either party, or that shall be the bearer of such challenge or acceptance; but the legal disability shall not accrue until after trial and conviction by due form of law."

In the consideration of this ground it may be well to bear in mind the difference between the State and the Federal Constitutions. This difference was well defined by this court in the second head-note in Cotton v. County Commissioners of Leon County, 6 Fla. 610, which is as follows: "In proceeding to define and determine the constitutional power of the legislative department, it is proper to note the characteristic difference which marks our

Federal and State Constitutions. Whilst the former contains only specific grants of powers, the latter makes a general grant of all the political power of the people, restrained only by specific reservations. Hence in determining upon the validity of statutes the acts of Congress are to be construed with greater stringency, than the acts passed by our General Assembly." Also see Chapman v. Reddick, 41 Fla. 120, text 133, 25 South. Rep. 673; State *ex rel.* Lamar v. Jacksonville Terminal Co., 41 Fla. 377, text 398, 400, 27 South. Rep. 225. Ex parte Henderson, 6 Fla. 279, also contains an interesting discussion generally of the point now under consideration. Also see Barber v. State, 13 Fla. 675, text 682; State *ex rel.* Florida Pub. Co. v. Hocker, 35 Fla. 19, 16 South. Rep. 614. In the light of these authorities, it is settled beyond cavil, as was said in Chapman v. Reddick, supra, text 133, that "Our State Constitution is a limitation upon the power; and unless legislation duly pased be clearly contrary to some express or implied prohibition contained therein, the courts have no authority to pronounce it invalid."

The power of the legislature to pass laws regulating appointments to stautory offices is absolute unless restrained by some constitutional provision. See State ex rel. Attorney General v. Covington, 29 Ohio St. 102, and authorities there cited; Darrow v. State, 8 Colo. 417; State *ex rel.* v. Thompson, 38 West Va. 485, 24 L. R. A. 343; State *ex rel.* v. Dillon, 32 Fla. 545, text 568; Hanna v. Young, 84 Md. 179, 34 L. R. A. 55.

The only constitutional provisions bearing upon this subject and presented for consideration here have been set out in full above.

Section 5 of Article 6 of the Constitution quoted in full above does not deal with the general subject of disqualifi-

cations of persons for office, but it simply makes it the duty of the legislature to enact the necessary laws to ex·clude from every office within the State the persons fall·ing within the classes therein named. It does not under-take to make such enumerated persons the only persons who may be excluded from offices to be established by the legislature. The constitutional duty to enact laws to ex-clude persons from office extends only to those referred to in the quoted section, and there the duty imposed by the Constitution in that respect stops. This section does not define or relate to jurisdiction, as did the one under consideration in Singer Manufacturing Co. v. Spratt, 20 Fla. 122, and in Ex-parte Cox, 44 Fla. 537, 33 South. Rep. 509. Neither does it undertake the regulation of any property right, as did the one under consideration in Hin-son v. Booth, 39 Fla. 333, 22 South. Rep. 687. It grants no power or authority but simply prescribes a duty, re-quiring the Legislature to enact laws excluding from every office the persons enumerated therein, but the lan-guage used cannot be said to forbid the Legislature from enacting laws excluding other persons than those named from statutory offices. The principle of the maxim, *expressio unius est exclusio alterius,* should be applied with great caution to the provisions of an organic law re-lating to the legislative department, and we are of the opinion that it is not applicable here. See State ex rel. Lamar v. Jacksonville Terminal· Co., *supra,* text 397 to 403 inclusive. As was said in State *ex rel.* Attorney Gen-eral v. Covington, *supra,* text 118, in the consideration of this matter, "we have confined ourselves, as was our duty to do, solely to the question of legislative power, without any thought or inquiry as to the wisdom of the act, or the motives which induced it."

Again, there being no inhibition in the constitution as to the creation of other offices than those named therein, but on the contrary there being an express recognition of such power in section 27 of Article 3 above quoted, the Legislature has the right to create such other offices and to prescribe the qualifications of the officers to be elected or appointed to such offices, so long as no provision of the constitution is infringed in so doing. Belles v. Burr, 76 Mich. 1, 43 N. W. Rep. 24; Plummer v. Yost, 144 Ill. 68, 33 N. E. Rep. 191, 19 L. R. A. 110; Hanna v. Young, 84 Md. 179, 35 Atl. Rep. 674, 34 L. R. A. 55. We have not been informed wherein the Constitution has been violated in the creation of the State Board of Control and the filling of the same by appointment by the Governor, as has been done by the act in question, otherwise than by the objections and argument in support thereof which we have just treated. This contention is not supported by the authorities.

Section 27 of Article 3 of the Constitution imposes upon the Legislature the duty of providing "for the election by the people or appointment by the Governor of all State and county officers not otherwise provided for by this Constitution," but the method of providing for such election or appointment is not prescribed, the only limitation being that the selection of such officers shall be by election or appointment. The constitution prescribes the qualifications of electors but not of persons who may be appointed or elected to such an office as the one under consideration. It seems to us, in the light of the cited authorities, that the Legislature was left absolutely free in the matter, to the extent that we have stated. The qualifications and exclusions mentioned in the act relate not to classes of persons, but to place and length of resi-

dence, and they do not in effect make the appointment to the office in question a legislative appointment; but, on the other hand, in compliance with the constitutional provision cited, such appointment is required to be made by the Governor, whose discretion of choice is not limited except as to reasonable and salutary requisites as to place and length of residence of persons to be appointed. There is nothing in the case of State *ex rel.* Clyatt v. Hocker, 39 Fla. 477, 22 South. Rep. 721, 63 Am. St. Rep. 174, cited by the relator, which is in conflict in any way with the views which we have just expressed. The case of State *ex rel.* Attorney General v. George, 23 Fla. 585, 3 South. Rep. 81, also cited by the relator, seems to us to militiate against his contention rather than to strengthen it, and we might well cite it in support of the conclusion which we have reached. As to the authorities from other courts cited by the relator we have given them a careful examination but find nothing therein sufficiently convincing to cause us to reach a different conclusion, our decisions being binding upon us.

It is further contended by the relator that the act is violative of section 15 of Article 4 of the constitution because it provides that members of the State Board of Control may be removed by the Governor, whereas said section provides that officers who have been appointed or elected may be removed by the Governor, for any of the causes therein named, by and with the consent of the Senate. We do not understand in what respect the act is in conflict with this constitutional provision. If the Governor should wish to remove one or more of such members, it is presumed that he would do so in the way prescribed by the constitution.

## VI.

We have now reached the sixth ground upon which the act is assailed as being unconstitutional, which is: "That it is provided by Section 25, Article 3 of the Constitution of the State of Florida that the Legislature shall provide by general law for incorporating such educational, agricultural, mechanical, transportation, mercantile and other useful companies or asociations as may be deemed necessary; but it shall not pass any special law on any such subject, and any such special law shall be of no effect; provided, however, that nothing therein shall preclude special legislation on the subject as to a university, or the public schools, or as to a ship canal across the State; whereas the said act contains special legislation on subjects forbidden by said section of the constitution, to-wit: The Florida Female College, the Institute for the Blind, Deaf and Dumb, the Colored Normal School and other institutions not connected with the university, the public schools, nor a ship canal across the State."

This section in its original form as found in the Constitution of 1885, ended with the word "necessary," and did not contain the words "transportation" and "mercantile." As 'amended under the joint resolution proposed by the Legislature in 1899, and adopted at the general election 1900, this section now reads as follows:

"Section 25. The Legislature shall provide by general law for incorporating such educational, agricultural, mechanical, mining, transportation, mercantile and other useful companies or associations as may be deemed necessary; but it shall not pass any special law on any such subject, and any such special law shall be of no effect; Provided, however, That nothing herein shall preclude special

legislation as to a university or the public schools, or as to a ship canal across the State."

In support of this objection the relator contends among other things, that the exclusion of a university and the public schools from the provisions of the section by the proviso necessarily includes in the provisions of the section the Florida Female College, the Institute for the Blind, Deaf and Dumb and the Colored Normal School, all of which are made the subject of special legislation in the act in question, although none of such institutions are connected with the university, the public schools or a ship canal across the State. It now behooves us to pass upon this contention and to determine whether or not it is well founded. Assuming that none of these institutions can be said to come under the terms "A university" or "a ship canal across the State," can they be held to be embraced in the term "the public schools?" Before undertaking to answer this question it may be well for us to first consider the circumstances which led to the adoption of the amendment to the section of the constitution now before us. That it is proper to do this, see Maxwell v. Dow, 176 U. S. 581, text 602, 20 Sup. Ct. Rep. 448, 494; Cooley's Constitutional Limitations (7th ed.) 100 and authorities cited in notes; 6 Amer. & Eng. Ency. of Law (2nd ed.) 921, 929, 930. This principle was applied by this court in construing provisions of the constitution in State *ex rel.* Attorney General v. George, 23 Fla. 585, 3 South. Rep. 81; State *ex rel.* Attorney General v. Johnson, 30 Fla. 433, 11 South. Rep. 855, 18 L. R. A. 410; Godwin v. King, 31 Fla. 525, 13 South. Rep. 108; State *ex rel.* Mitchell v. Bloxham, 26 Fla. 407, 7 South. Rep. 873. It will be observed that this section as it originally stood in the constitution of 1885 directed the Legislature to provide by general law for incorporating companies or associations

enumerated therein but did not prohibit their incorpora-
tion by special act, nor did it specifically include mer-
cantile and transportation companies.    As a consequence
the Legislature at every session was asked to grant many
special charters, especially for mercantile and transpor-
tation companies.    By reason of this fact the business
before the Legislature became congested, matters of the
utmost public importance were delayed and many bills
of both a public and private nature were enacted into laws
without mature consideration and corporations frequently
obtained peculiar advantages in their special charters to
the detriment of other bodies of like nature.    To remedy
this mischief or evil the amendment to the section of the
constitution in question was proposed and adopted.    This
is a matter of public notoriety.    As the word "educa-
tional" was one of the subjects embraced in the section
it was evidently thought advisable, out of the abundance
of caution, to preclude the possibility of an extension of
its meaning to State institutions, hence, the proviso with
reference to a university and the public schools.    Section
16 of Article 16 of the constitution exempted the property
of a corporation which should construct a ship canal
across the State from taxation, and it was thought ex-
pedient to exclude it also from the effect of the section.

Section 20 of Article 3 of the constitution, in force at
the time of the adoption of the amendment to section 25
of the same Article, expressly prohibits the Legislature
from passing special or local laws upon the many subjects
enumerated therein, while section 21 of the same Article
declared that "in all cases not enumerated or excepted in
that section (20), the Legislature may pass special or
local laws."    Without the proviso, then, in the amend-
ment to section 25 of Article 3, the amendment could not
apply to any subject not enumerated in section 20, unless

expressly named. But "the office of a proviso is not to enlarge or extend the act, or a section of which it is a part, but rather to be a limitation or a restraint, upon the language which the Legislature has employed." Black on Interpretation of Laws, 271. See State *ex rel.* Mc-Quaid v. Commissioners of Duval County, 23 Fla. 483, text 486, 3 South. Rep. 193; Southern Bell Telephone & Telegraph Co. v. D'Alemberte, 39 Fla. 25, 21 South. Rep. 570; Futch v. Adams, 47 Fla., 257, 36 South. Rep. 575; County Commissioners of Lake County v. State, 24 Fla. 263, 4 South. Rep. 795. It would seem, then, that the proviso, by excluding a university and the public schools from the provisions of the section, cannot by implication be held to bring within the terms of the section institutions which could not have come within its meaning without the proviso. However, let us look into the matter still more closely. Section 1 of Article 12 of the constitution requires that "The Legislature shall provide for a uniform system of public free schools, and shall provide for the liberal maintenance of the same." The proviso in the amendment in question could not have meant, then, the "public free schools," because they were required to be uniform, hence no special legislation could have been enacted concerning them. But, at the time of the adoption of said amendment, there was no university in the State and the only public schools, other than the public free schools were the Seminary at Tallahassee, the Seminary at Gainesville, the White Normal School at DeFuniak Springs, the Colored Normal School at Tallahassee, the Florida Agricultural College at Lake City, The Florida Military Institute at Bartow, and the Institute for the Blind, Deaf and Dumb at St. Augustine. Could it have been intended in adopting the amendment to prohibit any special legislation concerning any of these institutions?

If not, would not the Florida Female College established under Chapter 5384 of the Laws of 1905 fall within the same class? What then was meant by the term "the public schools" as used in the amendment? We are now better prepared to answer this question. Perhaps it might help us if we first examined the definitions of the two words "public" and "schools." Among the primary definitions of the word "public" given in Webster's International Dictionary, the standard authority, are these, "of or pertaining to the people; belonging to the people," while the first two definitions of the word "school" given are "a place for learned intercourse and instruction; an institution of learning." Couple the two definitions, "belonging to the people," and "an institution of learning," and we have a class into which all the institutions named readily fall, for every one of them is an institution of learning belonging to the people. They are public institutions of learning maintained and supported for public purposes by public taxation. See State *ex rel.* Garth v. Switzler, 143 Mo. 287, 45 S. W. Rep. 245, 40 L. R. A. 280; State *ex rel.* Attorney General v. Knowles, *supra*, text 616. Also see the definitions of the two words "public" and "schools" as given in Anderson's Law Dictionary. It should also be borne in mind that the term "public schools" is a comprehensive one and it should not be narrowed or restricted in its meaning, which frequently must be ascertained from the context. Sometimes it is used as synonymous with common or primary schools, at other times it is used in a far more comprehensive sense. The following authorities are instructive upon this point as showing the different constructions put upon the term: Cooke v. School District No. 12, 12 Colo. 453, text 456, 21 Pac. Rep. 496, 719; St. Joseph's Church v. Assessors of Taxes of Providence, 12 R. I. 19; Merrick v. Inhabitants

of Amherst, 12 Allen (Mass.) 500, text 508; Jenkins v. Inhabitants of Andover, 103 Mass. 94, text 97; Gordon v. Cornes, 47 N. Y. 608, text 616; People v. Crissey, 45 Hun. 19, text 21; Collins v. Henderson, 11 Bush (Ky.) 74, text 82 *et seq.;* Roach v. Board of President and Directors of the St. Louis Public Schools, 77 Mo. 484, text 487.

Remembering that "The established rules of construction applicable to statutes also apply to the construction of constitutions," 8 Cyc. 729, what meaning are we to give to the term "the public schools," as used in the amendment in question? We must hold that something was intended by the term, and give effect to it if possible. Goode v. State, decided at this term, and authorities cited therein. We have already found that "public free schools," as used in Section 1 of Article 12 of the Constitution, could not have been intended, and also that the only other public schools existing in the State, at the time of the adoption of the amendment, were those which we have enumerated above and which are attacked by this objection of the relator which we are now considering. It is not obvious in the light of the cited authorities that these institutions must be held to be embraced in the term "the public schools?" Are we not logically impelled to this conclusion? Must these institutions not have been in the legislative mind at the time of the adoption of the joint resolution proposing the amendment?

But it is earnestly contended by the relator that, whatever conclusion we may reach in regard to the other institutions named in the act, we cannot hold the Institute for the Blind, Deaf and Dumb embraced within the term "the public schools," because to so hold would contravene section 1 of Article 13, and section 17 of Article 4 of the constitution, which two sections are as follows:

25 S. C.

"Section 1. Institutions for the benefit of the insane, blind and deaf, and such other benevolent institutions as the public good may require, shall be fostered and supported by the State, subject to such regulations as may be prescribed by law."

"Section 17. The Governor and the administrative officers of the executive department shall constitute a board of commissioners of State Institutions, which board shall have supervision of all matters connected with such institutions in such manner as shall be prescribed by law."

We cannot agree to this contention. The first quoted section expressly makes such an institution "subject to such regulations as may be prescribed by law," and we find nothing in the act which prohibits the Board of Commissioners of State Institutions from having *"supervision* of all matters connected with such institutions in such manner as shall be prescribed by law."

However, granting this contention, how does it help the relator's objection? Subject this objection interposed by the relator to the constitutionality of the act to a still more searching analysis. Does the act fall within the term "special law," or can it be held to be "special legislation?" As we have already seen, all the institutions in question are public institutions. In the light of what has been said by this court, defining special legislation, in Ex-parte Wells, 21 Fla. 280, text 309 *et seq.;* State *ex rel.* McQuaid v. Commissioners of Duval County, 23 Fla. 483, text 488, 3 South. Rep. 193; Bloxham v. Florida Cent. & P. R. Co., 35 Fla. 625, text 731 *et seq.,* 17 South. Rep. 902; *State ex rel.* Attorney General v. Jacksonville Terminal Co., 41 Fla. 363, 27 South. Rep. 221; Givens v. Hillsborough County, 46 Fla. 502, 35 South. Rep. 88, which cases we shall not now take the time to analyze, can the act in question be held to be special legislation?

We are of the opinion that under the reasoning applied in the cited cases the question must be answered in the negative. Again none of the institutions in question is incorporated by the act, but only the State Board of Control, of which in our Advisory Opinion, 49 Fla. 269, 39 South. Rep. 63, we held that "The duties to be performed by such board are important and essentially governmental in character." The Board of Control as thus incorporated is not an "educational, agricultural, mechanical, mining, transportation, mercantile or useful company or association" having an independent existence for private purposes. It is nothing more than a subordinate public agency, created in aid of a public purpose. It is but a part of a general system for the regulation, government and management of "Schools of Higher Grades" authorized by section 3, Article 12, and section 1, Article 13 of the constitution. This being true, we do not see how the provisions of Section 25 of Article 3 of the Constitution as amended could be held to apply to this Board.

The cases of Neil v. Board of Trustees of the Ohio Agricultural and Mechanical College, 31 Ohio St. 15, and State ex rel. Van Riper v. Parsons, 40 N. J. L. 1, text 9, will also prove instructive upon the point as to what constitutes special legislation.

Thus looked at from every view-point, this objection interposed by the relator must be held to be untenable.

## VII.

The seventh objection urged by the relator is: "That it is provided by section 3, Article 12 of the constitution of the State of Florida that the Governor, Secretary of State, Attorney General, State Treasurer and Superintendent of Public Instruction shall constitute a body corpo-

rate to be known as the State Board of Education of
Florida; and it is provided in and by said act, Chapter
5384, that the State Board shall for certain purposes
therein mentioned, to-wit: the location of the several in-
stitutions therein provided for and other purposes, be a
joint board with the Board of Control provided for in and
by the said act, which provisions attempts to increase the
number of the State Board of Education and to add other
persons thereto, and to intermingle outside persons with
the constitutional board and to have an outside board act
as a part of a constitutional board, to have said constitu-
tional board, to-wit: said State Board of Education act
as a joint board contrary to the constitution of said
State; and it is also provided in and by said section 3,
Article 12 of the constitution of the State of Florida that
the said State Board of Education shall have management
and investment of all State school funds under such regu-
lation as shall be provided by law and such supervision of
schools of higher grades as the law shall provide; whereas
it is provided in said act that the Board shall have super-
vision of the Board of Control therein provided for in
the management and conduct of the several institutions
therein and thereby provided for which said institutions
are not part of the system of public free schools of the
State and in conflict with the limitations upon the power
of the legislature to add or increase the power and duties
of the State Board of Education of Florida in matters
unconnected with their constitutional jurisdiction."

Section 3 of Article 12 of the constitution, provides that
the State Board of Education, among other things, shall
have "such supervision of schools of higher grades as the
law shall provide." We find nothing in the act in ques-
tion which excludes such supervision. In fact, section 15
of the act expressly provides that the State Board of Con-

trol shall be "at all times under and subject to the control and supervision of the State Board of Education." Section 3 of Article 12, a portion of which has just been quoted, contemplates that the Legislature should provide by law what supervision of schools of higher grade such board should have. There is no inhibition restraining such board from acting in conjunction with any other board, body or individuals concerning such matters. See French v. State ex rel. Harley, 141 Ind. 618, 41 N. E. Rep. 2, 29 L. R. A. 113; Shoemaker v. United States, 147 U. S. 282, 13 Sup. Ct. Rep. 361. It is the settled law in this State, as we have seen, that "While constitutional prohibitions upon the legislature need not always be express, but may arise from implication, yet the implied prohibition must result from the insertion of some express provision, as mere silence of the constitution cannot be construed as a prohibition. The rule is that nothing shall be regarded as prohibited which is not so either expressly or by fair and reasonable implication." State ex rel. Attorney General v. Jacksonville Terminal Co.. 41 Fla. 377, text 399, 27 South. Rep. 225, and authorities there cited. As to the argument made concerning the intermingling of outside persons with a Constitutional Board and having such outside persons act jointly in matters with constitutional officers, it is a sufficient reply to say that this has frequently been done in different laws enacted by the Legislature, and, so far as we are informed, the right so to do has never been questioned in our courts. See some of the instances cited by us at the close of division III of this opinion. Also see section 17 of Chapter 1766 of the laws of Florida of 1870, brought forward into the Revised Statutes of 1892 as section 296, imposing certain duties upon the Comptroller as to making examinations into the actions and doings of the trustees of the Florida Agricul-

tural College; Section 3 of Chapter 1905 of the Laws of Florida of 1872 constituting the Superintendent of Public Instruction, by virtue of his office as such, president of the said college; Section 2 of Chapter 3045 of the Laws of Florida of 1877, constituting the Superintendent of Public Instruction and the State Treasurer, by virtue of their offices as such, President and Treasurer respectively of the Board of Trustees of said college. Also see Chapter 4565 of the Laws of 1897, establishing a State Reform School.

We are not informed that any of these cited provisions of the different laws have been attacked in our courts as being unconstitutional. This practical construction and long prevailing custom is a matter of which the courts can take judicial notice and is entitled to consideration. See Bloxham v. Consumers' Electric Light & St. R. Co., 36 Fla. 519, 18 South. Rep. 444, 51 Amer. St. Rep. 44, 29 L. R. A. 507; State v. Garhardt, 145 Ind. 439, 44 N. E. Rep. 469, 33 L. R. A. 313; City of Terre Haute v. Evansville & T. H. R. Co., 149 Ind. 174, text 186, 37 L. R. A. 189; Smith v. Indianapolis Street Railway Co., 158 Ind. 425, text 435, 63 N. E. Rep. 489; Stuart v. Laird, 1 Cranch (U. S.) 299. This objection even if tenable would not make the entire act unconstitutional. Section 15 of the act expressly provides that the Board of Control shall be at all times under and subject to the control and supervision of the State Board of Education.

## VIII.

The eighth ground of attack is: "That it is provided for in Section 14, Article 12 of the Constitution of the State that the Legislature at its first session shall provide for the establishment, maintenance and management of

such Normal Schools, not to exceed two, as the interests of the public education might demand, and that thereafter the Legislature at its session held in 1887, by act approved on May 31, 1887, did establish and have until the passage of the said act maintained such Normal Schools, one established at Tallahassee and the other at DeFuniak Springs; and whereas it is provided in and by the said act that the said State Normal School established and located at DeFuniak Springs be disestablished and added to the University therein provided for as a part thereof."

This contention does not strike us with much force. The provision of the constitution invoked in its support leaves it entirely to the judgment and discretion of the legislature as to how many normal schools "not to exceed two as the interests of public education may demand." The act in question expressly provides for a Colored Normal School and also for a normal *department* to the University, and also confers upon the State Board of Education and the State Board of Control, acting jointly, authority "to establish and maintain a Normal *Department* for the instruction of white female teachers in the Florida Female College," at any time it may be deemed necessary. This seems to us to be a sufficient compliance with the constitutional provision which it is claimed the act violates.

## IX

This brings us to the ninth objection interposed, which is: "That it is provided in Section 16, Article 3 of the Constitution of the State that each law enacted in the Legislature shall embrace but one subject and matter properly connected therewith, which subject shall be briefly expressed in the title; and whereas the said act is

in conflict therewith and is void and of no effect in that the same contains more than one subject and matter properly connected therewith, which several and divers subjects are expressed both in the title and body of the act, to-wit: (1) A University of the State; (2) The Florida Female College; (3) The Institute for the Blind, Deaf and Dumb at St. Augustine, Florida; (4) The State Normal School for Colored People at Tallahassee; (5) The Seminary East of the Suwannee River at Gainesville, Florida; (6) The Seminary West of the Suwannee River at Tallahassee, Florida; (7) The Normal School for White Students at DeFuniak Springs, Florida; (8) The Normal School at St. Petersburg, Florida; (9) The South Florida Military College at Bartow, Florida; (10) The provisions for examinations for the public free schools and high schools of the State; (11) The provisions for summer schools; (12) Appropriation of property to high schools."

The determination of this question is fraught with more difficulty than any of the objections which we have yet considered. Let it be frankly admitted that the title to the act in question is decidedly objectionable for many reasons. Among others which might be stated are that it is very prolix, being unduly drawn out, contains much unnecessary matter, is cumbersome and awkwardly worded. However, no matter how strongly these objections may appeal to us, or however much we may disapprove of the title, that does not help us to answer the question, which is has the provision of the constitution been violated? This provision is section 16 of Article 3, and reads as follows:

"Section 16. Each law enacted in the legislature shall embrace but one subject and matter properly connected

therewith, which subject shall be briefly expressed in the title; and no law shall be amended or revised by reference to its title only; but in such case the act, as revised, or section, as amended, shall be re-enacted and published at length."

The authorities quoted and cited by us in the introductory portion of this opinion concerning the rules of constitutional construction apply with full force here also. See especially the cardinal rule enunciated in State *ex rel.* Turner v. Hocker, 36 Fla. 358, text 363 *et seq.*

As bearing upon this point, see the following decisions of this court: Advisory Opinion 14 Fla. 285; Gibson v. State, 16 Fla. 291; State *ex rel.* Attorney General v. Knowles, 16 Fla. 577, text 613 *et seq.;* Carr v. Thomas, 18 Fla. 736, text 747; City of Jacksonville v. Basnett, 20 Fla. 525; Ex-parte Wells, 21 Fla. 280, text 324; State *ex rel.* McQuaid v. Commissioners of Duval County, 23 Fla. 483, text 504 *et seq.,* 3 South. Rep. 193; State *ex rel.* Gonzales v. Palmes, 23 Fla. 620, text 627 *et seq.,* 3 South. Rep. 171; Saunders v. Provisional Municipality of Pensacola, 24 Fla. 226, text 235 *et seq.,* 4 South. Rep. 801; County Commissioners of Lake County v. State, 24 Fla. 263, 4 South. Rep. 795; Holton v. State, 28 Fla. 303, text 308, 9 South. Rep. 716; Smith v. State, 29 Fla. 408, text 417, 10 South. Rep. 894; State *ex rel.* Attorney General v. Green, 36 Fla. 154, text 181, 18 South. Rep. 334; County Commissioners of Duval County v. City of Jacksonville, 36 Fla. 196, text 224, 18 South. Rep. 339, 29 L. R. A. 416; State *ex rel.* Turner v. Hocker, 36 Fla. 358, 18 South. Rep. 767; Webster v. Powell, 36 Fla. 703, text 715, 18 South. Rep. 441; State *ex rel.* Attorney General v. Burns, 38 Fla. 367, text 386 *et seq.,* 21 South. Rep. 290; State *ex rel.* Attorney General v. Jacksonville Terminal Co., 41 Fla.

363, 27 South. Rep. 221, 5th head-note; State *ex rel.* Attorney General v. Jacksonville Terminal Co., 41 Fla. 377, text 414, 27 South. Rep. 225; Florida East Coast Ry. Co. v. Hazel, 43 Fla. 263, text 266, 31 South. Rep. 272, 99 Amer. St. Rep. 114; Potter v. Lainhart, 44, Fla. 647, text 655, 673, 33 South. Rep. 251; Schiller v. State, 49 Fla. 25, 38 South. Rep. 706; West v. State, 50 Fla. ..., 39 South. Rep. 412.

We have collated the foregoing decisions of this court upon the constitutional provision in question, which, we believe, are all that have been rendered, in order that we might the more readily examine them and ascertain just what the settled law in this court is before resorting to the decisions of other courts, which, as is well known, are in a state of hopeless and irreconcilable conflict.

The following principles seem to be well established:

1. The evils or mischiefs intended to be remedied by the adoption of this constitutional provision were (a), as was said in Gibson v. State, *supra,* text 299, quoting and approving the following language from Walker v. Caldwell, 4 La. Ann. R. 298, "The title of an act often afforded no clue to its contents. Important general principles were found placed in acts, private or local, in their operation; provisions concerning matters or practice or judicial proceedings were sometimes included in the same statute with matters entirely foreign to them, the result of which was that on many important subjects the statute law had become almost unintelligible, as they whose duty it has been to examine or act under it can well testify. To prevent any further accumulation of this chaotic mass was the object of the Constitutional provision under consideration," this court then adding, "Nearly all of the States having Constitutions of recent

adoption have incorporated therein provisions in nearly identical language, and their courts agree as to the purpose of such provisions. They also agree that the provision refers to the subject-matter of the legislation, and not to a single purpose or end sought to be accomplished. Its purpose was to avoid the confusion incident to the evil which had grown out of 'omnibus' legislation." (b) As was said in State *ex rel.* Gonzales v. Palmer, *supra,* text 629, "Of course one of the purposes of this provision was to prevent surprise or fraud upon the Legislature by means of provisions in bills of which the title gave no notice, and which might, therefore, be overlooked, and carelessly and unintentionally adopted." (c) "The purpose of the Constitutional provision is to prevent 'hodge-podge or log-rolling' legislation, surprise or fraud upon the Legislature by means of provisions in acts of which the titles give no intimation, and to fairly apprise the people of the subjects of legislation being enacted." State *ex rel.* Attorney General v. Green, *supra,* 5th headnote; County Commissioners of Duval County v. City of Jacksonville, *supra;* State *ex rel.* Turner v. Hocker, *supra;* Webster v. Powell, *supra;* State *ex rel.* Attorney General v. Burns, *supra;* Potter v. Lainhart, *supra.*

2. (a) "While the provision in the Constitution is mandatory, still there has been a general disposition in the courts of this and other States to construe it liberally rather than embarrass legislation by a construction where strictness is unnecessary to the accomplishment of the beneficial purpose for which it was adopted." State *ex rel.* Attorney General v. Knowles, *supra;* (b) "While this provision of the constitution is mandatory and of as much binding force upon the Legislature and upon the courts as any other provision in that instrument, and

while it is the duty of the courts to declare legislative enactments void, when questioned, that are clearly non-complaint with its requirements, still the courts in construing the acts of the legislative branch of the government should always apply a liberal rule, and refuse to declare its action void, except in clear cases that are free from every reasonable doubt," Holton v. State, *supra;* State *ex rel.* Attorney General v. Green, *supra;* County Commissioners of Duval County v. City of Jacksonville, *supra;* State *ex rel.* Turner v. Hocker, *supra;* Webster v. Powell, *supra;* State *ex rel.* Attorney General v. Burns, *supra;* Florida East Coast Ry. Co. v. Hazel, *supra;* Potter v. Lainhart, *supra;* Schiller v. State, *supra.*

(3) "It is sufficient that the title should express the *subject* and that it is not necessary for it to set out 'the matter properly connected therewith,'" State *ex rel.* McQuaid v. County Commissioners of Duval County, *supra;* Ex-parte Wells, *supra;* Schiller v. State, *supra.*

(4) "If the title fairly gives notice of the subject of the act, so as reasonably to lead to an inquiry into the body of the bill it is all that is necessary. It need not be an index to the contents." Holton v. State, *supra;* State *ex rel.* McQuaid v. County Commissioners of Duval County, *supra;* State *ex rel.* Gonzalez v. Palmer, *supra;* State *ex rel.* Attorney General v. Green, *supra;* State *ex rel.* Attorney General v. Burns, *supra.*

(5) "The title of an act may be general, and so long as the generality of the subject therein expressed is not employed as a guise to conceal the real object of the law, or some provision therein, it will not be objectionable. It is also true that the title to an act may be so restrictive as to confine the body of the act to such phase of the subject as is indicated by the title." County Commissioners

of Duval County v. City of Jacksonville, *supra;* State *ex rel.* Gonzales v. Palmer, *supra;* State *ex rel.* Attorney General v. Burns, *supra;* Florida East Coast Ry Co. v. Hazel, *supra;* Potter v. Lainhart, *supra.*

(6) "The amplification of the title to an act so as to make it expressly mention matters germane to and properly connected with its general subject does not vitiate such title or subject it to the criticism of having dealt with two distinct or incongruous subjects." State v. Jacksonville Terminal Co. 41 Fla. 363, 27 South. Rep. 221, 5th head-note.

Other principles discussed in the different decisions of this court might be set forth as having been established thereby, but the foregoing, we believe, will prove sufficient to enable us to, dispose of the objection interposed by the relator which we are now considering.

A careful reading of the cited decisions impels us to the conclusion that the settled policy of this court is to uphold legislative enactments, unless it is made to appear beyond a reasonable doubt that some constitutional provision has been violated. As was ' said in Holton v. State, *supra,* "Every reasonable doubt should be resolved in favor of the constitutionality of the act assailed." Also see the full discussion on page 309 *et seq.* in said opinion concerning the constitutional provision we are now considering.

Let us now examine the objection interposed by the relator and the argument in support thereof, in the light of the principles which we have found to have been enunciated by this court. Does this much assailed Chapter 5384 of the Laws of Florida of 1905 contain twelve distinct subjects, "which several and divers subjects are expressed both in the title and in the body of the act?" What is the real subject of the act? May it not well be

said to be a reorganization of the institutions for higher
and special education in the State of Florida, or simply,
schools, or public schools, or institutions of learning, or
public institutions of learning, or educational institu-
tions, or public educational institutions, or special edu-
cational institutions, or institutions of special learning,
or other similar designation, and would not all the pro-
visions contained in the act be  embraced in  such sub-
ject and matters properly connected therewith?  Every
one of the institutions mentioned in the act is a public
educational institution, and every provision contained in
the act relates to at least one of the  institutions   men-
tioned therein, and is embraced within the subject men-
tioned and matters properly connected therewith.   Admit
that the title does not in express terms give the subject of
the act, yet it contains brief mention  of practically all
the different provisions contained in the act, all of which
provisions, as we have seen relate to but one subject and
matters properly connected therewith.   We might   well
treat as surplusage much of what is contained in the title,
as was intimated in Saunders v. Provisional Municipal-
ity of Pensacola, 24 Fla. 226, text 236, 4 South. Rep. 801,
might be done, still, as was said therein, the title would be
sufficient, and the superfluous matter contained therein
is "of itself calculated to call the  legislator's  attention
more fully to the existing legislation to be effected."   See
the reasoning in State *ex rel.* Gonzales v. Palmes, *supra,*
text 628; Ex-parte Wells, *supra,* text 324; State *ex rel.*
Attorney General v. Green, *supra,* text 181; County Com-
missioners of Duval  County v.  City  of  Jacksonville,
*supra,* text 224; State *ex rel.* Turner v.  Hocker,  *supra,*
text 364; State *ex rel.* Attorney General v. Burns, *supra,*
text 387; Florida East Coast Ry. Co. v.  Hazel,  *supra,*
text 268; Potter v. Lainhart, *supra,* text 674.

It seems to us that this objection imposed by the relator is effectually disposed of by the reasoning used in the cases we have cited. We would also refer to division VI of this opinion, wherein we discussed the sixth objection interposed, reaching the conclusion that all the institutions in question must have been within the legislative mind when the joint resolution was adopted proposing an amendment to Section 20 of Article 3 of the Constitution. We find nothing in the Advisory Opinion, 14 Fla. 285, cited by the relator, which is in conflict with the views herein expressed.

We also refer to Crookston v. Board of County Commissioners, 79 Minn. 283, 82 N. W. Rep. 586, 79 Amer. St. Rep. 453, and especially to the exhaustive note on pages 456 to 486 inclusive of 79 Amer. St. Rep. where many authorities are collected and the subject fully treated. Also see Chapter IV of Lewis' Southerland's Statutory Construction (2nd ed.), especially Section 134, to the effect that "The subject of an act may be expressed generally in the title, or spelled out from details which are independent and unconnected except through some general subject as *cousins german* are related through a common ancestor. According to the authorities the general subject need not appear in the title, if it is clearly disclosed or readily inferred from the details expressed," and authorities cited in notes 63 and 64; Isenhour v. State, 157 Ind. 517, 62 N. E. Rep. 40, 87 Am. St. Rep. 228. Also see note to Bobel v. People, 64 Amer. St. Rep. 77, and authorities cited. A very instructive case is Attorney General v. Lowrey, 131 Mich., 639, which was affirmed by the U. S. Supreme Court on Nov. 13, 1905, ... U. S.

## X.

The tenth objection interposed, which is the last in the information proper, is: "That the said act, Chapter 5384, attempts to vest the assets and property of the Institute for the Blind, Deaf and Dumb in the State Board of Education, and to vest the control, possession and management thereof and of said institute in said Board of Control and to authorize the joint board consisting of the State Board of Education and the Board of Control to determine as to change of location of said institute and to do every other matter or thing in that connection necessary and requisite to carry out the purposes of said act; in violation of the constitution of the State of Florida by which said institute for the Blind, Deaf and Dumb is made and declared to be a public institution, jurisdiction and supervision of which is by said constitution given to and vested in the Board of Commissioners of State Institutions."

We have already treated this objection in disposing of the sixth objection, in division VI of this opinion, and but little more remains to be said.

The provisions in the act in question relate to the "education and industrial training of the blind, deaf and dumb" (see section 20), and we find nothing therein violative of section 1 of Article 13 or section 17 of Article 4 of the constitution, which sections are copied in full in division VI of this opinion.

When we consider the scope of the institution for the blind, deaf and dumb as revealed in the statutes relating thereto, providing as they do for the attendance of pupils from the ages of six to twenty-one, and longer if necessary for graduation, for competent teachers, for instruction which shall fit the pupils for aiding in earning a sup-

port, and in sharing the enjoyments of life, for graduating them, and that this school stands in the place of all other schools to the members of society for whom it is established, and that by section 1, Article 13 of the constitution it shall be subject to such regulations as may be prescribed by law, we are not able to say that the constitution has been violated by classing it in a system with "Schools of higher grades," and by giving the State Board of Education the supervision of the Board of Control under the statute here considered.

The manner of such supervision is not prescribed by the constitution, but is authorized thereby to "be prescribed by law," and the institution in question is to be "subject to such regulation as may be prescribed by law." The objection is not tenable.

## XI.

The first additional ground urged in the amendment to the information is: "That the Legislature has attempted to delegate its legislative power to the said Boards of Education and Control in and as to each and all of the several matters and subjects covered by said act."

This ground is quite general and we have already considered and disposed of it in other divisions of this opinion. See especially divisions I, II and III. The powers conferred by the act upon the State Board of Education and the State Board of Control are not legislative in their nature but are administrative.

## XII.

The second additional ground is: "That said act seeks to create an office, to-wit: The office of member of the Board of Control, or State Board of Control, the incum-

26 S. C.

bent of which may be removed by the Governor, contrary to the Constitution of the State under which such officers should only be removed by and with the consent of the Senate."

We have discussed this ground in division V of this opinion and decided it adversely to this contention of the relator. We see no occasion for repeating or amplifying what we said there.

## XIII.

The third additional ground is: "That the incorporation of the Florida Agricultural College into the University of the State of Florida is not contained in or covered by the title of the act."

As a matter of fact, at the time of the passage of the act in question, there was no such institution existing as the Florida Agricultural College. Section 3 of Chapter 1766 of the Laws of Florida of 1870, originally incorporating said college, was repealed by Chapter 1905 of the Laws of Florida of 1872, and section 2 of said Chapter 1905, which changed some of the incorporation features, was amended by Section 1 of Chapter 3045 of the Laws of Florida of 1877, which last named section was brought forward, with some changes, into the Revised Statutes of 1892 as section 280. This section of the Revised Statutes was amended by section 1 of Chapter 4233 of the Laws of Florida of 1893, which abolished the incorporation feature. While Chapter 5272 of the Laws of Florida of 1903 changed the name of the institution from the Florida Agricultural College to the University of Florida, as we saw in division II of this opinion, though it did not incorporate the University of Florida. Neither is the University of the State of Florida incorporated under

the provisions of Chapter 5384 of the Laws of Florida of 1905. See division VI of this opinion. We have treated fully the objections urged against the title of the act in division IX of this opinion. Suffice it to say that we find no merit in this objection.

### XIV.

The fourth additional ground is: "That the declaration that the property of the Florida Agricultural College is the property of the State is not a legislative, but a judicial act, and is an encroachment of the legislature upon the functions of the judiciary."

A sufficient reply to this objection is that property which belongs to the State may be disposed of by the Legislature without the aid of the courts. This is a legislative prerogative. See State *ex rel.* Attorney General v. Knowles, 16 Fla. 577, text 616, quoted in division I of this opinion.

### XV.

The fifth and last additional ground in the amendment is:

"That the act is a revision of all the statutes of the State on the subjects of the various schools and colleges of the State above the grade of common free schools, and does not re-enact and publish at length any of the said laws, except section 269 of the Revised Statutes."

We cannot agree to this contention. The act in question is an independent statute covering a general and comprehensive subject. In addition to what we have already said in this opinion concerning the act in question and the authorities we have cited, see Lake v. State

*ex rel.* Palmer, 18 Fla. 501. We also refer again to State *ex rel.* Attorney General v. Knowles, 16 Fla. 577, text 615; Ex-parte Wells, 21 Fla. 280, text 307; State *ex rel.* Attorney General v. Covington, 29 Ohio St. 102, text 118, quoted by us in division V of this opinion.

We have now discussed every ground alleged in the information and the amendment thereto against the constitutionality of the act. We have also borne in mind, as is urged by the relator, that all that is required in an information of this character is that it shall be set up therein that the respondents are holding the office or exercising the functions thereof without authority or warrant of law, which allegations may be of the most general character. 17 Ency. of Pl. & Pr. 458; State *ex rel.* Attorney General v. Phillips, 30 Fla. 579, 11 South. Rep. 922, and authorities cited therein; Simonton v. State, 44 Fla. 289, 31 South. Rep. 821. We listened with attentive interest to the oral arguments of the able counsel for the relator and have examined with great care their elaborate briefs and have considered every point urged by them. Surely if any other grounds of unconstitutionality exist against the act they would not have escaped their ingenuity and diligence but would have been called to our attention.

It was suggested in the oral argument of one of the counsel for the respondents that the information was so worded concerning the admission of "no student to the Florida Female College except such *white* female students as may or shall have passed a satisfactory examination in some high school of this State or some other State having a like standing and through and beyond the 10th grade as now established for high schools of this State," as to suggest the intention on the part of the relator to raise the Federal question that the act was violative of the 14th Amendment to the Constitution of the United States.

Immediately, however, counsel for the relator positively disclaimed any intention to raise any such question and expressly repudiated the same, therefore, we have not considered or passed upon that point.

Applying, then, the cardinal rule repeatedly enunciated by this court concerning the construction of statutes, the constitutionality of which is questioned, we reach the conclusion that no clear violation of the constitution by the act in question has been made to appear to us, therefore, we would not be justified or warranted in overthrowing it. The Legislature has expressed its will in passing the act, the Governor has duly approved the same and acted thereunder by making appointment as prescribed therein. As a co-ordinate branch of the Government, nothing less than an abiding conviction in our minds, beyond a reasonable doubt, would warrant us in declaring it unconstitutional. It follows, then, from what has been said, that the ninth ground of the demurrer is well taken, therefore, the demurrer must be sustained and the information quashed, and it is so ordered.

In closing this long opinion, we wish to express our high appreciation of the signal ability displayed by the learned counsel for the relator and the respondents in the presentation of the different points involved in this case. We have found both their oral arguments and their briefs enlightening and educative, thereby materially lessening our labors. We have realized the gravity of the questions involved and of their far-reaching consequences to the public, and have reached the conclusions announced herein only after the most thorough investigation and mature consideration.

It has been a source of gratification to us to find so many of the questions propounded answered by prior de-

cisions of this court, and we would pay a just tribute to the learning, ability and industry of our predecessors on this bench.

In conclusion we again wish to call attention to the fact that with the wisdom or folly of the act, justice or injustice thereof, we have nothing to do. State *ex rel.* Attorney General v. Dillon, 32 Fla. 545, 14 South. Rep. 383, 22 L. R. A. 124; Bloxham v. Florida Cent. & P. R. Co., 35 Fla. 625, 17 South. Rep. 902. The sole question we are called upon to decide is does the act conflict with the constitution? If not, we are bound to uphold it.

Demurrer sustained and information quashed.

HOCKER, WHITFIELD and PARKHILL, JJ., concur.

COCKRELL, J., disqualified.

TAYLOR, J., because of local interests involved, recused himself and took no part in the decision of the case.